Argued and submitted July 28, 1993, affirmed on appeal; reversed and remanded in part on cross-appeal August 3, petition for review allowed November 22, 1994
(320 Or 407)

Sigitas BANAITIS,
*Respondent - Cross-Appellant,*

*v.*

MITSUBISHI BANK, LTD.,
and Bank of California, N.A.,
*Appellants - Cross-Respondents,*

*and*

Karen LESH,
*Defendant.*

(A8912-07357; CA A70113)

879 P2d 1288

372-b

James N. Westwood argued the cause for appellants - cross-respondents. With him on the briefs were Black Helterline, Michael O. Moran and Miller, Nash, Wiener, Hager & Carlsen.

Charles J. Merten and John Paul Graff argued the cause for respondent - cross-appellant. With them on the briefs were Merten & Associates, Graff & O'Neil and Glen H. Downs.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

## LANDAU, J.

Defendants appeal from a judgment awarding plaintiff compensatory damages on his claim for wrongful discharge against defendant the Bank of California, N.A. (BanCal), and on his claim for interference with a contractual relationship against defendant Mitsubishi Bank, Ltd. (MBL). Plaintiff cross-appeals a judgment notwithstanding the verdict that deprived him of a jury award of punitive damages against both defendants.[1] We affirm on the appeal and reverse on the cross-appeal.

We state the facts in the light most favorable to plaintiff. Plaintiff, a former vice president of BanCal, began working for the bank in 1980. MBL is a financial institution in the "Mitsubishi Group," a collection of related companies in Japan. In 1984, MBL acquired directly 13 percent of the stock in BanCal. It then acquired a holding company that held the balance of BanCal's stock. MBL transferred a number of its officers from Tokyo to manage the bank. One of those officers, Tanaka, remained an MBL employee, but was given a title at BanCal. Tanaka was plaintiff's supervisor from late 1986 until plaintiff's termination.

BanCal had a policy of keeping its customers' financial information confidential. It stated that policy in its employee policy manual, and each year employees were required to certify that they understood the policy. An employee who breached the confidentiality policy was subject to immediate dismissal.

When MBL acquired BanCal, a number of BanCal's customers expressed concern that MBL would acquire information from BanCal that would be used by other members of the Mitsubishi Group for competitive advantage. Some customers stopped doing business with BanCal. Others demanded written confidentiality agreements that would insure that their financial information would not be disclosed to MBL.

In the fall of 1986, an employee of MBL telephoned plaintiff and asked him to supply a "comparison chart on

---

[1] All claims against defendant Karen Lesh were dismissed, and she is not a party to this appeal. Therefore, when we refer to defendants, we mean MBL and BanCal.

[BanCal's] grain company customers." The comparison chart that MBL requested contains information that shows the relative financial positions of five large grain shippers, including each company's cash on hand, accounts receivable, inventory of grain, accounts and notes payable, long-term indebtedness, net worth, cost of goods, operating expenses, profit and inventory turnover. Knowledge of that information would give a competitor an advantage in the marketplace. Plaintiff refused the MBL employee's request for the chart, explaining that disclosure of the information was against bank policy, against the law and unethical. When the MBL employee explained that he sought the information for MBL's internal use only, plaintiff responded that he would not release the information without written authorization from the bank's president.

In September, 1986, the manager of MBL's Portland office made a similar request of plaintiff, this time asking for confidential financial information about a particular customer, Schnitzer Steel Industries, Inc. (Schnitzer). Schnitzer was one of the BanCal customers that had demanded express promises from BanCal that confidential information would not be disclosed to MBL or any member of the Mitsubishi Group. Plaintiff again refused MBL's request.

Soon after that, in February, 1987, Tanaka wrote a performance evaluation that falsely accused plaintiff of not meeting his 1986 budget. In June, 1987, Tanaka falsely accused plaintiff of going to New York on business without approval. Tanaka also accused plaintiff of being dishonest and questioned his integrity. In August, 1987, BanCal put plaintiff on probation for 90 days, based on another evaluation that reiterated the earlier falsehoods and added new false charges.

Plaintiff's probation was over in mid-November, but BanCal did not dismiss him. Meanwhile, plaintiff informed BanCal's Human Resources Department that he could not stay at the bank and offered to negotiate a smooth departure. On December 16, while negotiations continued, plaintiff told his staff at a breakfast meeting that he would be leaving the bank soon. He had anticipated that he would continue to work at least through December 31, 1987, so that he would receive the full value of the bank's contributions to his pension fund

for 1987. However, Tanaka and BanCal's Human Resources Department accelerated his departure date to December 30, 1987, thus depriving him of those pension benefits. Plaintiff received notice of that decision in a letter hand-delivered by Tanaka. Plaintiff then was instructed that he had 30 minutes to "clean out his desk." He protested that he could not possibly complete the task that quickly, so he was allowed to remove his things the next day after working hours. Other employees were instructed to watch him while he packed.

Plaintiff commenced this action on December 12, 1989. He alleged a claim against BanCal for wrongful discharge and a claim against MBL for interference with a contractual relationship. The complaint included demands for punitive damages against both defendants.

At the close of the evidence at trial, defendants moved for directed verdicts on both claims. The trial court denied the motions, and the jury returned a verdict for plaintiff, awarding plaintiff compensatory and punitive damages against both defendants. Defendants then moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied that motion with respect to the verdict for compensatory damages. It granted the motion with respect to punitive damages on both claims, and it denied the alternative motion for a new trial.

In the first assignment of error, BanCal contends that the trial court erred in denying its motion for directed verdict, because plaintiff failed to produce evidence of a *prima facie* case for wrongful termination. BanCal concedes, for the purpose of the motion, that it deliberately made plaintiff's working environment so unpleasant that he had to leave, and that it did so in retaliation for his withholding BanCal's confidential customer information from MBL. According to BanCal, that does not constitute wrongful termination, because plaintiff was an at-will employee, and the reason for his discharge does not fall within any exception to the general rule that at-will employees may be discharged at any time, for any reason.

■　In reviewing the denial of the motion for directed verdict, we consider the evidence, including the inferences, in the light most favorable to the nonmoving party, and the

verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary" to support the verdict. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *see also Hirsovescu v. Shangri-La Corp.*, 113 Or App 145, 147, 831 P2d 73 (1992).

In general, an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement. *Patton v. J. C. Penney Co.*, 301 Or 117, 120, 719 P2d 854 (1986). There are exceptions to the general rule. A cause of action will lie against an employer who discharges an employee for performing a public duty, or fulfilling a societal obligation such as serving on a jury, *Nees v. Hocks*, 272 Or 210, 219, 536 P2d 512 (1975), or refusing to commit a potentially tortious act of defamation, *Delaney v. Taco Time Int'l.*, 297 Or 10, 17, 681 P2d 114 (1984). An employer also may be held liable for discharging an employee for pursuing private statutory rights that are directly related to the employment, such as resisting sexual harassment by a supervisor, *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90-97, 689 P2d 1292 (1984), or filing a claim for workers' compensation benefits, *Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978).

In this case, plaintiff contends that his termination for refusing to disclose confidential information falls within the "societal obligation" or "public duty" exception to the at-will rule. According to plaintiff, there is a public duty to avoid disclosing valuable, confidential customer financial information held by a bank. That public duty, he argues, is evidenced by a host of state and federal statutes that generally protect business information from discovery by or disclosure to the public or to government agencies. In particular, plaintiff relies on federal and state public records statutes, rules of civil procedure and various criminal statutes, all of which protect against disclosure of confidential financial information.

BanCal argues that plaintiff's refusal to divulge the requested information implicates no societal obligation or public duty. It argues that none of the statutes on which plaintiff relies specifically applies to the disclosure of customer financial information held by a bank. Without such

statutes, "carefully tethered" to the specific conduct at issue, BanCal contends, there can be no societal obligation or public duty.

We first address the parties' arguments concerning the standard that we must apply in determining whether a societal obligation or public duty is implicated. In deciding the question whether an employer could be held liable for discharging an employee for serving on a jury, the Supreme Court in *Nees v. Hocks, supra,* looked to the provisions in the Oregon Constitution preserving the right of jury trials, to various statutes describing exemptions from jury service and consequences for neglecting to show up for jury service, and to case law from other jurisdictions concerning the importance of jury duty. The court concluded:

> "These actions by the people, the legislature and the courts clearly indicate that the jury system and jury duty are regarded as high on the scale of American institutions and citizen obligations. * * * For these reasons we hold that the defendants are liable for discharging plaintiff because she served on the jury." 272 Or at 218.

The constitutional provisions on which the court relied, as well as the statutes and the case law, do not impose an obligation of jury service. Nevertheless, the court drew on them as indicia of the public policy that it found to be the basis for liability.

Likewise, in *Delaney v. Taco Time Int'l, supra,* in which the Supreme Court considered whether an employer could be found liable for discharging an employee who refused to sign a false performance evaluation, the court relied on two provisions of the Oregon Constitution, Article I, sections 8 and 10. Neither of those provisions prohibits a person from defaming another. Nevertheless, the court concluded that "[t]hese two sections indicate that a member of society has an obligation not to defame others." 297 Or at 17; *see also Holien v. Sears, Roebuck and Co., supra,* 298 Or at 83.

In short, there is no requirement, as BanCal contends, that a specific statute has been violated before we may conclude that a societal obligation or a public duty has been implicated. We must review all the relevant "evidence" of a

particular public policy, whether that be expressed in constitutional and statutory provisions or in the case law of this or other jurisdictions. We turn, then, to the issue of whether discharging an employee for refusing to disclose a customer's confidential financial information falls within the societal obligation exception to the at-will rule. We conclude that it does.

Numerous statutes reflect a legislative recognition of the important public policy of protecting from disclosure confidential commercial and financial information. The Federal Right to Financial Privacy Act of 1978, 12 USC § 3401 *et seq*, prohibits, with certain exceptions, the disclosure of a customer's records by a financial institution to a government authority without the customer's consent. The Federal Freedom of Information Act, 5 USC § 552, similarly exempts from disclosure by public agencies any "commercial or financial information" that is privileged or confidential. 5 USC § 552(b)(4). The Oregon Public Records Act, ORS 192.501(2), likewise exempts from disclosure any

> "compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it."

In a related vein, ORCP 36C(7) authorizes courts to issue protective orders to avoid disclosure of "a trade secret or other confidential * * * commercial information." *See also* FRCP 26(c)(7).

Various criminal statutes reflect a public interest in protecting the confidentiality of commercial financial records. ORS 165.095(1) provides that a person who "misapplies" property entrusted to a financial institution commits a crime. Removal or disclosure of a bank's files or other property is a Class C felony. ORS 708.715.[2]

---

[2] Plaintiff argues that other statutes reflect a public policy of protecting confidential customer financial information. In particular, plaintiff relies on the Oregon Trade Secrets Act, ORS 646.461(4), and the Federal Antitrust Improvements Act, 18 USC § 1905, which governs disclosure of confidential information by officials of the United States government. BanCal argues that those statues are irrelevant, because the information involved in this case does not constitute a "trade

At common law, the courts in a number of jurisdictions have recognized a bank's duty not to divulge to a third party, without the customer's consent, any information relating to the customer acquired through the keeping of the customer's account. As the Idaho Supreme Court said in *Peterson v. Idaho First National Bank*, 83 Idaho 578, 367 P2d 284 (1961):

> "It is inconceivable that a bank would at any time consider itself at liberty to disclose the intimate details of its depositors' accounts. Inviolate secrecy is one of the inherent and fundamental precepts of the relationship of the bank and its customers or depositors." 83 Idaho at 588.

*See also Burrows v. Superior Court*, 13 Cal 3d 238, 243, 118 Cal Rptr 166, 529 P2d 590 (1974); *Barnett Bank of West Florida v. Hooper*, 498 So 2d 923, 925 (Fla 1986); *Indiana Nat. Bank v. Chapman*, 482 NE2d 474, 480 (Ind App 1985); *Suburban Trust Co. v. Waller*, 44 Md App 335, 340, 408 A2d 758 (1979); *Pigg v. Robertson*, 549 SW2d 597, 600 (Mo App 1977); *Djowharzadeh v. City Nat. Bank & Trust Co.*, 646 P2d 616, 619-20 (Okla Ct App 1982). Consistent with that rule, BanCal's own internal policy prohibits the disclosure of confidential customer financial information.

Those statutory provisions, rules and common law principles reflect a common concern for the protection of valuable commercial financial information, particularly when that information has been entrusted to a bank. Permitting a bank to discharge with impunity its employee for refusing to disclose confidential customer financial information would violate that public policy and compromise the protections that the statutes, rules and common law duties were designed to afford.

BanCal acknowledges the foregoing authorities. It also concedes that they concern the type of confidential customer financial information that is involved in this case. It nevertheless maintains that most of the statutory provisions only establish limitations on the authority of governmental agencies — not banks — to disclose that confidential customer

secret" within the meaning of those statutes. Because we find ample evidence in other statutes of a public policy to protect confidential customer financial information, we do not address whether the trade secrets statutes apply.

financial information. It also insists that the authorities that do concern the disclosure of information entrusted to banks only give rise to *private* remedies and, therefore, cannot be evidence of important *public* policies.

BanCal's arguments rest on an incorrect character- ization of the standard we apply in discerning the existence of a societal obligation or public duty. As we have said, it is not necessary that a statute specifically regulate the conduct that precipitated the discharge. We review statutes and other authorities for evidence of a substantial public policy that would, as the Supreme Court said in *Nees v. Hocks, supra*, be "thwarted" if an employer were allowed to discharge its employee without liability. 272 Or at 219.

■ Moreover, BanCal's argument rests on an incorrect characterization of the statutes. Several do more than merely create private remedies. ORS 165.095(1), for example, makes it a crime for any person to misapply property entrusted to a financial institution.[3] And ORS 708.715 establishes criminal penalties for removal of files or other property from a bank. The legislature's decision to attach a criminal penalty to that conduct is a strong indication that it views the protection of property entrusted to a bank to be a matter of public impor- tance. *Nees v. Hocks, supra*, 272 Or at 219; *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 110, 684 P2d 21, *rev den* 298 Or 37 (1984).

The trial court did not err in denying BanCal's motion for a directed verdict.

The second and third assignments of error concern the trial court's disposition of MBL's affirmative defense that plaintiff's claim for intentional interference with contractual relations was time-barred. MBL had alleged that any injury to the plaintiff's contractual relation with BanCal occurred in

---

[3] BanCal asserts that ORS 165.095(1) "is aimed at the likes of embezzlement and diversion of funds or property, not at information sharing." That argument is contradicted by the Supreme Court's decision in *State v. Hitz*, 307 Or 183, 766 P2d 373 (1988), in which the court held that

"[t]he section was designed by the Criminal Law Revision Commission to define an offense *distinct from existing crimes of embezzlement and fraudulent misap- plication of entrusted property* by not requiring an intent to deceive, injure, or defraud anyone." 307 Or at 185. (Emphasis supplied.)

early 1987, when he first suffered from tension, sleeplessness, short temper and other symptoms of emotional distress resulting from Tanaka's criticism and accusations. Therefore, MBL concluded, when plaintiff filed his complaint on December 12, 1989, it was beyond the applicable two-year limitation period. ORS 12.110(1). At trial, plaintiff argued that the limitation period did not begin to run until December 17, 1987, the date he was discharged. On that basis, he moved for a directed verdict on MBL's statute of limitations defense, and the trial court granted the motion. At the same time, MBL moved for a directed verdict in its favor on the same defense, which the trial court denied. MBL assigns error to both rulings.

MBL argues that the limitation period on a tortious interference claim begins to run when the first injury occurs and plaintiff knows or should know of the harm and that defendant is responsible for it. The "injury" that triggers the limitation period, MBL contends, occurs when a person acts in a way that makes another's job performance more onerous, and the emotional distress that Tanaka's actions caused plaintiff in early 1987 satisfies that requirement.

To maintain a claim for interference with contractual relations, an injury to the contractual relation must be established. *Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 621, 733 P2d 430 (1987). That injury requirement may be satisfied by proof that the defendant caused a third party actually to breach its contract with plaintiff. *Mooney v. Johnson Cattle*, 291 Or 709, 711, 634 P2d 1333 (1981). Or it may be satisfied by proof that

> "defendant's wrongful actions have rendered plaintiff's obligations more onerous or prevented plaintiff from realizing the full benefit of his contract with a third party." *American Sanitary Service v. Walker*, 276 Or 389, 393, 554 P2d 1010 (1976).

Conduct that causes a plaintiff to suffer stress in the performance of his or her contract is not sufficient. For example, in *Franklin v. PCC*, 100 Or App 465, 787 P2d 489 (1990), the plaintiff brought an action for intentional interference with a contractual relationship, alleging that the defendant had issued false reprimands, used racial epithets and suggested that he work elsewhere, all of which caused him to suffer

stress and to use a substantial amount of sick leave as a result. We held that those allegations were insufficient to satisfy the requirement that there be an injury to the contractual relationship. Stress alone, we held, is not an injury to the contractual relationship. 100 Or App at 468-69.

In this case, MBL's sole argument is that Tanaka's conduct in delivering a negative evaluation based on falsehoods caused plaintiff to suffer emotional distress in early 1987. It does not argue that Tanaka's conduct made plaintiff's employment obligations more onerous or prevented plaintiff from realizing the full benefit of his employment relationship at that time in any sense other than the emotional distress he suffered. Accordingly, MBL's argument that it established that plaintiff suffered an injury to his contractual relation with BanCal in early 1987 fails, as a matter of law, and the trial court did not err in disposing of the statute of limitations defense.

In the fourth assignment of error, MBL argues that the trial court erred in denying its motion for a directed verdict on the intentional interference with contractual relations claim. According to MBL, because it owned BanCal, MBL was effectively a party to the employment contract between BanCal and plaintiff, and, as a result, MBL cannot be held liable for interfering with a contract between plaintiff and itself. In support of that argument, MBL relies solely on a federal district court's interpretation of Georgia state law. *Morast v. Lance*, 631 F Supp 474 (ND Ga 1986), *aff'd* 807 F2d 926 (11th Cir 1987).

The rule in Oregon is that a party to a contract cannot be held liable for interference with that contract. *Lewis v. Oregon Beauty Supply Co.*, *supra*, 302 Or at 625-26. The Oregon courts, however, have never held that a parent company's mere ownership of stock in a subsidiary completely shields the parent from liability for interfering with a contract between the subsidiary and a third party.

Moreover, MBL's reliance on the *Morast* decision is misplaced. In that case, the plaintiff had been employed as an executive vice president of a bank. In that capacity, he also had served as president and member of the board of directors of a wholly owned subsidiary of the bank. When he was fired

from both positions, he brought an action against the board of directors of the bank for interfering with his contractual relations with the subsidiary. In his complaint, he alleged that the subsidiary was wholly owned by the bank and subject to the direct control of the board of directors of the bank. In granting a motion to dismiss the claim, the federal court commented, without any citation to authority, that

"in his complaint [the plaintiff] alleges that [the subsidiary] is a wholly owned subsidiary of the bank, and that it is 'directly under the control of and pursuant to the authority of' the board of directors of the bank. It is difficult to perceive how the defendants could thus have acted as third parties in removing plaintiff from both positions of employment." *Morast v. Lance, supra,* 631 F Supp at 482.

That decision, however, was later expressly disavowed by the Georgia Court of Appeals in *Sunamerica Financial v. 260 Peachtree St.,* 202 Ga App 790, 798, 415 SE2d 677, *cert den* 202 Ga App 907 (1992); *see also Moore v. Barge,* 210 Ga App 552, 436 SE2d 746 (1993). We need not decide whether we nevertheless should adopt that rule now, because even if we did, it would not apply in this case. The evidence does not establish beyond dispute that MBL directly controlled Ban-Cal. MBL does not own BanCal outright; it owns only 13 percent of BanCal's stock. The rest of BanCal's stock is owned by an intermediary holding company, and there is no conclusive evidence that MBL either controls the holding company or controls BanCal through its control of the holding company. Ownership of stock, by itself, is insufficient to establish actual control of a corporation. *See Amfac Foods v. Int'l Systems,* 294 Or 94, 107, 654 P2d 1092 (1982); *Wakeman v. Paulson,* 257 Or 542, 544, 480 P2d 434 (1971). Further, defendants testified extensively that MBL did *not* control BanCal, either directly or indirectly. On the record before us, it simply cannot be said that, as a matter of law, MBL was a party to plaintiff's employment contract with BanCal. The trial court did not err in denying the motion for a directed verdict on the intentional interference claim.

■ In the next two assignments of error, BanCal contends that the trial court gave improper jury instructions on the wrongful discharge claim. We review the trial court's rulings on requests for instructions to determine whether the instructions probably created in the minds of the jurors an

erroneous impression of the law that affected the outcome of the case. *Waterway Terminals v. P.S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970); *Huston v. Trans-Mark Services*, 45 Or App 801, 812, 609 P2d 848, *rev den* 289 Or 587 (1980).

 The court delivered the following two instructions:

"To recover under this claim, plaintiff must show by a preponderance of the evidence either, one, the Bank of California terminated plaintiff's employment for refusing to violate public policy, or two, constructively discharged plaintiff's employment or plaintiff for refusing to violate public policy and three, that plaintiff was damaged as a result.

"The public policy of this state protects financial and other business information having independent economic value which is entrusted to a financial institution on a confidential basis from intentional disclosure by the financial institution unless the disclosure is authorized by the entity to which it pertains or by law."

According to BanCal, the instructions should have used the term "societal obligation," instead of the phrase, "public policy." The term "public policy," it contends, was repudiated by the Supreme Court in *Harrell v. Travelers Indemnity Company*, 279 Or 199, 567 P2d 1013 (1977). BanCal argues that the second instruction compounded that error by describing the so-called "public policy" in terms that find no support in constitutional or statutory provisions that are directly applicable to this case.

Although it may be true that the phrase "public policy" is, in some ways, less precise than the words "societal obligation," we cannot say that that rendered the trial court's instructions incorrect. The Supreme Court, in fact, frequently has described the exception to the at-will rule using the terms "public duty," "societal obligation" and "public policy," with no apparent intention to draw distinctions among those terms. *See, e.g., Holien v. Sears, Roebuck and Co., supra,* 298 Or at 83; *Delaney v. Taco Time Int'l., supra,* 297 Or at 15-16. BanCal's reliance on *Harrell v. Travelers Indemnity Company, supra,* for its argument to the contrary is misplaced. That case was not a wrongful discharge case and did not discuss any exception to the at-will rule. At issue was whether "public policy" provided a basis for invalidating a

provision in an insurance policy. In that context, the court commented that

"for a court to undertake to invalidate private contracts upon the ground of 'public policy' is to mount 'a very unruly horse, and when you once get astride it you never know where it will carry you.' " 279 Or at 206 (quoting 14 *Williston on Contracts* 7-8, § 1629 (3d ed 1972)).

The court nevertheless articulated a rule that, in certain circumstances, a contract may be held invalid as contrary to public policy.

◼ In any event, BanCal has not asserted, much less demonstrated, any prejudicial effect of using the term "public policy" in the jury instructions. Apart from the use of those two words, the instructions the court delivered did not substantially depart from the instructions BanCal itself requested. Particularly when the court instructed the jury on the specific public policy that applied in this case, we cannot say that the instructions, taken as a whole, caused the jury to decide the case one way or the other. *See State v. Williams*, 313 Or 19, 39, 828 P2d 1006, *cert den* ___ US ___, 113 S Ct 171, 121 L Ed 2d 118 (1992).

BanCal insists that the court's description of the relevant public policy—the protection of financial and other business information that has been entrusted to a bank — was incorrect, because it finds no basis in any specific constitutional or statutory provision. That, however, is the same argument that BanCal asserts in urging reversal of the trial court's denial of the motion for a directed verdict on the wrongful discharge claim. For the same reasons we rejected the argument in that context, we reject it again here. The trial court did not err in delivering its instructions on the wrongful discharge claim.

◼ In the seventh assignment of error, MBL asserts that the trial court erroneously instructed the jury concerning its defense that it was privileged to interfere with the contract between plaintiff and BanCal. MBL had asserted that Tanaka had acted as an agent of BanCal, and that, when he took actions that resulted in plaintiff's discharge from BanCal, he was subject to a privilege of an agent to induce his or her

principal to breach a contract in good faith to serve the interests of the principal.

The trial court gave the following instructions concerning that issue:

"A person or corporation may be privileged to interfere with another's economic expectations. The privilege exists only when each of the following conditions are met:

"One, when the person or corporation is acting to promote an interest which is equal to or superior in social value to the interest being interfered with;

"Two, the interfering person or corporation was acting in good faith;

"Three, the interfering person or corporation was acting with the intent to benefit a related party although the person or corporation may have an intent to benefit itself as well;

"Four, the interference was without malice or ill will to the person whose economic expectations are interfered with;

"And five, the person or corporation did not employ improper means to achieve the interference. If the privilege exists, the holder of the privilege is not liable for the interference."

MBL excepted to those instructions as follows:

"Defendants except to the giving of the instruction with regard to the privilege that is the mixed motive privilege, in that—it includes the requirement that interference by the person who has the privilege was without malice or ill will to the person whose economic expectations are interfered with. I do not believe that is what *Welch* [*v. Bancorp Management Services*, 296 Or 208, 675 P2d 172 (1983)] requires. I believe that *Welch* requires that the person's behavior be in good faith toward benefiting the related party."

On appeal, MBL argues that the instructions were erroneous for three reasons. First, it argues that the trial court improperly placed the burden of proving the defense of privilege on defendant MBL. Second, it argues that the trial court improperly required MBL to prove each of five elements, when only one would suffice to establish its privilege to interfere. Third, it argues that the trial court improperly required a complete absence of malice, when evidence of a "mixed motive" of malice and good faith would have sufficed to establish the existence of a privilege.

■ MBL failed to preserve the first two arguments. Neither was the subject of its exception to the instruction below. *See Delaney v. Taco Time Int'l, supra,* 297 Or at 18-19. In any event, the trial court did not, in fact, instruct the jury that MBL was required to prove the existence of a privilege. The court did not even describe privilege as a defense. After stating that plaintiff bears the burden of proving each of the elements of his claim, the trial court then listed those elements, followed by a series of definitions of terms. The trial court then said that, if certain conditions are met, a "privilege exists." The trial court did not say that defendant had to establish those conditions. Although the court's description of the elements of the privilege in the passive voice is not entirely clear, viewing the instructions in context, we cannot say that the jury was misled.

As for MBL's third argument, that the court's instruction erroneously required proof of something less than complete malice or ill will, we disagree that that is what the instruction required. The trial court told the jury that, for a privilege to apply, MBL must have acted "without malice or ill will." MBL reads that statement to preclude the existence of a privilege if there is evidence of *any* malice or ill will, however slight; in other words, MBL argues, the instruction eliminates a privilege to interfere when an agent acts with "mixed motives." Assuming that MBL's characterization of the law is correct, we cannot say that the instruction, when viewed in context, is incorrect. The instructions on the *prima facie* case required plaintiff to prove that defendant interfered by improper means or with an improper motive, and defined "improper motive" to consist of

"a *purely malicious intent to harm the plaintiff* out of a sense of spite and a desire to do harm for its own sake." (Emphasis supplied.)

The trial court did not err in delivering its instruction concerning the privilege to interfere.

■ In their last assignment of error, defendants assert that the trial court should not have allowed one of plaintiff's witnesses to offer so-called "social framework" testimony about Japanese business practices. At trial, plaintiff called Kozo Yamamura, a professor of East Asian studies and international business, chairman of the Japanese studies program

at the University of Washington, and author of books and articles about Japanese economic policies and business strategies. The majority of his testimony concerned the history of Japanese business organizations, employment practices and business strategies. Plaintiff asked the witness three questions about the gathering and sharing of information within Japanese corporate organizations. Defendants objected to each of those questions on the ground that they called for irrelevant testimony. The trial court overruled the objections.

Plaintiff then asked the witness a hypothetical question about how a Japanese company might treat an employee who refused to divulge requested financial information. Defendants again objected that the question called for irrelevant testimony, and the trial court overruled the objection. Three days after the conclusion of the witness's testimony, and after plaintiff had rested, defendants moved to strike the testimony elicited in response to the hypothetical question. The trial court denied the motion.

On appeal, defendants argue that the trial court erred in overruling their objections to the questions about general Japanese business information sharing practices. They also argue that the trial court erred in denying their motion to strike the testimony elicited in response to the hypothetical question.

We address first the objections to the questions about Japanese business practices concerning information sharing. Defendants argue that the questions called for information about racial and cultural stereotypes, which was irrelevant and unfairly prejudicial under OEC 401, 403 and 404(2). Plaintiff argues that defendants failed to preserve any argument that it was unfairly prejudicial, and that the testimony is relevant. We agree with plaintiff.

To be preserved for review, an objection must include its specific basis. OEC 103(1)(a). An objection under OEC 401 that a question calls for irrelevant testimony does not preserve an argument on appeal under OEC 403 that the question called for testimony that is unfairly prejudicial. *State v. Carillo*, 108 Or App 442, 445, 816 P2d 654, *rev den* 312 Or 527 (1991).

In this case, the only stated basis for defendants' objections to the questions about information sharing within Japanese business organizations was relevancy. Defendants argue that, even though they did not specifically state that the testimony also would have been prejudicial, they are not precluded from arguing that on appeal, because the judge clearly understood the basis for their objections. Defendants rely on *State v. Keller*, 315 Or 273, 284, 844 P2d 195 (1993). We disagree with defendants.

In *Keller*, the Supreme Court reviewed a claim of error notwithstanding the defendant's failure to identify at trial a specific ground for that objection, because the defendant had earlier repeatedly asserted the same grounds for his objections to the same type of testimony from the same witness. *Keller* is unavailing in this case, however, because defendants have failed to identify any point during Yamamura's testimony at which they objected to his testimony on the grounds that it would be unfairly prejudicial under OEC 403 or that it would be impermissible character evidence under OEC 404(2). Consequently, the only argument that defendants have preserved is that the questions concerning information sharing among Japanese business organizations called for irrelevant testimony.

Evidence is relevant if it has a tendency to make the existence of any fact at issue more probable or less probable than it would be without the evidence. OEC 401. Plaintiff argues that Yamamura's testimony

"supplied the context for understanding Mitsubishi's appetite for business information, and why plaintiff—by refusing to disclose such information and thus uphold his obligations under American law and banking practices—would be deemed disloyal by MBL, and an obstacle to be eliminated."

In other words, the testimony about the extent to which Japanese business organizations routinely share financial information, expect employees to cooperate in that sharing process and retaliate for a failure to cooperate in that regard tends to make it more likely that MBL, a Japanese business conglomerate, expected plaintiff to comply with its requests and then retaliated by causing his discharge when he failed to do so. Defendants insist that the testimony is irrelevant, but aside from complaining about its prejudicial effect, they do

not explain why plaintiff's argument as to relevancy is unsatisfactory. To be sure, the connection between the testimony and the issues in this case is somewhat attenuated. Nevertheless, there is at least the minimal logical connection that is required by OEC 401. The trial court did not err in overruling defendants' objections.

We next address defendants' motion to strike Yamamura's testimony in response to the hypothetical question about how a Japanese company might treat an employee who refused to divulge confidential customer financial information. It bears noting that defendants do not assign error to the trial court's ruling on their objections to the testimony; their assignment is directed solely at the trial court's ruling on their motion to strike. Plaintiff argues that, whatever the merits of the motion, it was not timely made. We agree.

A motion to strike is untimely, unless it is made "as soon as the ground for the motion [is] disclosed." *McEwen v. Ortho Pharmaceutical*, 270 Or 375, 421, 528 P2d 522 (1974) (quoting *Wallender v. Michas*, 256 Or 587, 592, 475 P2d 72 (1970)). In this case, defendants moved to strike the testimony three days after Yamamura had completed his testimony, after six other witnesses had testified and after plaintiff had rested. The motion was untimely made, and there was, therefore, no error in denying it.

Plaintiff's cross-appeal concerns the jury's award of punitive damages against both MBL and BanCal. After finding in favor of plaintiff and awarding him compensatory damages against both defendants, the jury found that employees of MBL and BanCal were "guilty of wanton misconduct within the scope of their employment." The jury then awarded $3 million in punitive damages against MBL and $2 million against BanCal. Both defendants moved for judgment notwithstanding the verdict on the punitive damage awards, and the trial court granted the motions, concluding that

"there is no evidence that either defendant ratified the alleged acts of its employees or, indeed, that they were acting within the scope of their employment."

The trial court expressly found that its ruling was not predicated on the amount of the punitive damages, but rather on

the fact that there was no evidence to support an award of any punitive damages. Plaintiff assigns error to the trial court's order granting defendants' motions.

Plaintiff argues that there is, in fact, evidence to support the jury's award. Defendants assert the trial court correctly disposed of the punitive damages awards. According to defendants, punitive damages against an employer are permissible only when there is evidence that the employee engaged in wanton misconduct within the scope of his or her employment *and* that the employer ratified, or was at least on notice of, the employee's conduct. There is no evidence, defendants contend, of either MBL's or BanCal's knowledge of their employees' conduct in asking plaintiff to disclose confidential customer financial information and then discharging him for failing to do so. In support of their argument, defendants cite *Stroud v. Denny's Restaurant*, 271 Or 430, 532 P2d 790 (1975), and *Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 803 P2d 1178 (1991).

In *Stroud*, a restaurant was sued for malicious prosecution when its cook performed a citizen's arrest of a customer who refused to pay for a meal. The jury returned a verdict in favor of plaintiff and awarded punitive damages. The restaurant appealed, arguing that it could not be subject to punitive damages because it did not direct or ratify its employee's conduct. The Supreme Court rejected that argument. It adopted what it characterized as the majority rule that

> "when an employee commits a wrongful act which would subject him personally to punitive damages, the essential inquiry must be whether the act was committed while the employee was acting within the scope of his employment." 271 Or at 437.

Nothing in *Stroud* lends support for defendants' argument.

In *Badger*, the plaintiffs sued an investment company for securities fraud, on the basis of the conduct of two of its agents. The plaintiffs sought to hold the investment company liable for punitive damages on the ground that the agents, although exceeding their actual authority, engaged in misconduct with apparent authority to act for the company. In that context, the Supreme Court said that an innocent

employer cannot be held liable for punitive damages for the wrongdoing of its agents, unless it "was aware of, approved of, ratified, or countenanced" the agents' actions. *Badger v. Paulson Investment Co., Inc., supra*, 311 Or at 28. The court distinguished that rule from the rule it announced in *Stroud*, because "[a] finding of apparent authority is not the equivalent of a finding of acting within the scope of employment." 311 Or at 28. *Badger*, likewise, lends no support for defendants' argument that there must be proof of their ratification or knowledge of their employees' misconduct. Therefore, if there was evidence that defendants' employees acted within the scope of their employment, that evidence is sufficient to establish defendants' liability for punitive damages, based on the employees' acts, whether or not defendants ratified or knew of those acts. Defendants argue that there is, in fact, no such evidence. According to defendants, their employees could not have acted within the scope of their employment when they caused plaintiff to be discharged, because discharging an employee for failing to disclose confidential customer financial information would have been "in direct *contravention* of [their] employer's policies and directive." (Emphasis in original.) The argument misses the point. Tortious conduct undoubtedly is seldom part of an employee's duties. Nevertheless, whether an employee acts "within the scope of employment" depends on

> " 'whether the servant at the time of the commission of the injury was performing a service for the master in furtherance of the master's business, not whether it was done in exact observance of detail prescribed by his employer.' " *Stroud v. Denny's Restaurant, supra*, 271 Or at 437, (quoting *Tyler v. Moore et al.*, 111 Or 499, 509, 226 P 443 (1924)).

In this case, there is evidence that Tanaka, an employee of MBL, and the director of Human Resources, an employee of BanCal, were assigned the responsibilities of supervising plaintiff's work, including evaluating his performance and, if necessary, imposing discipline. When an officer of MBL asked plaintiff to disclose confidential customer financial information and Tanaka and BanCal's Human Resources director took actions to obtain his discharge when he refused, they were doing the very things they were hired to do. They may have done those things badly, or with improper motives, or by improper means. But the fact remains that a

jury could find that they did them within the scope of their employment.

Defendants argue that, even if there was *some* evidence that their employees acted within the scope of their employment, that is not sufficient, because we should review for "clear and convincing evidence" of that fact. Defendants concede that our decision in *Faber v. Asplund Tree Expert Co.*, 106 Or App 601, 810 P2d 384, *rev den* 312 Or 80 (1991), is to the contrary. In that case, we held that the clear and convincing evidence standard generally governs how a jury weighs the evidence, not to how a court assesses the sufficiency of the evidence to support the jury's verdict. 106 Or App at 606. Defendants nevertheless question the "wisdom" of that decision, particularly in the light of the United States Supreme Court's decision in *Honda Motor Co. v. Oberg*, ___ US ___, 114 S Ct 2331, 129 L Ed 2d 336 (1994). We find no reason to reexamine the standard of review for a jury's decision to award punitive damages.

In *Oberg*, the Court held that the Due Process Clause of the Fourteenth Amendment requires that there be a process to review the *amount* of punitive damages awarded by a jury. In this case, the trial court decided that there was no evidence to support any award of punitive damages. It expressly stated that it did not decide that the *amount* of the award was inappropriate. This is not an *Oberg* case, and we decline defendants' invitation to reexamine our holding in *Faber*.

The trial court erred in granting defendants' motion for judgment notwithstanding the verdict on the jury's award of punitive damages.

Affirmed on appeal; on cross-appeal, reversed and remanded for reinstatement of jury verdict awarding punitive damages.