**Sigitas BANAITIS, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 02–70421.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2003.

Filed Aug. 27, 2003.

Joseph Wetzel and Russell A. Sandor; Wetzel, DeFrang, & Sandor; and Philip N. Jones; Duffy Kekel LLP; Portland, OR; for the petitioner.

Eileen J. O'Connor, Richard Farber, and Kenneth Rosenberg, United States Department of Justice, Tax Division; Washington, DC; for the respondent.

Before BEEZER, THOMAS, and CLIFTON, Circuit Judges.

## OPINION

THOMAS, Circuit Judge.

Sigitas Banaitis appeals the United States Tax Court's entry of judgment in favor of the Commissioner of Internal Rev-

enue regarding a $1,708,216 deficiency in Banaitis' 1995 income tax. We affirm in part and reverse in part.

## I

From 1980 until late 1987, Sigitas Banaitis, an Oregon resident, worked as a vice president and loan officer with the Bank of California. On behalf of the Bank of California, Banaitis developed grain-focused finance activity in Portland, Oregon, then the largest grain exporting port on the west coast. Banaitis had access to private information regarding the companies with which he worked. This private information included, among other things, data regarding these companies' comparative financial, inventory, and margin strengths, as well as information regarding their respective profitabilities. Much of this information was culled from confidential financial statements. To ensure the security of this information, Banaitis and the Bank of California executed confidentiality agreements.

Sometime in 1984, Mitsubishi Bank acquired a controlling interest in the Bank of California. Mitsubishi Group, Ltd., Mitsubishi Bank's parent company and then the largest company in the world, controlled and operated firms competing directly with a number of Banaitis' loan customers. Anticipating the potential conflict engendered by Mitsubishi Bank's acquisition of the Bank of California—namely, the potential exposure of sensitive financial information—many of Banaitis' customers contacted him, imploring Banaitis to keep the financial information with which he was entrusted confidential; indeed, some went so far as to request that their financial information be sequestered under lock and key.

Banaitis complied with his customers' wishes to keep this sensitive information confidential, refusing to disclose the data when asked to do so by employees of Mitsubishi Bank and the Bank of California. But Banaitis' refusal to disclose was apparently not well-received by Mitsubishi Bank or the Bank of California. Within months of Banaitis' action, Banaitis received an unfavorable performance review, a review that criticized Banaitis for inadequate business performance and accused him of dishonesty and improper employee conduct. Banaitis was placed on work probation.

Troubled by his employment situation, Banaitis apparently suffered a host of physical maladies; his symptoms included headaches, insomnia, gastrointestinal disorders, bleeding gums, and various orthopedic problems. By December 30, 1987, Banaitis' work situation had grown so intolerable that Banaitis left his job, a decision prompted by his employer's delivery of a letter stating that Banaitis had resigned and that he had only 30 minutes to clean out his desk. If Banaitis had been employed for one more day, his pension for 1987 would have vested for that year.

On November 15, 1989, Banaitis retained the law firm of Merten & Associates (hereinafter "Merten") to pursue legal action against Mitsubishi Bank and the Bank of California. To ratify his relationship with Merten, Banaitis signed a document titled "Contingent Fee Retainer Agreement (Statutory Attorneys Fees)." In general, the fee agreement provided for the payment of one-third of the gross settlement prior to commencement of a trial or arbitration and for forty percent of the gross recovery thereafter. Through this agreement, Merten was authorized to "accept a structured payment of the attorneys fee directly from the adverse party." Any award of statutory attorneys fees paid by the opposing parties would be credited toward the amount Banaitis owed Merten. The agreement also required Banaitis to approve the acceptance or rejection of any

settlement offer, empowering Merten to terminate its representation of Banaitis if, generally stated, Banaitis behaved unreasonably as a client.

Less than a month after retaining Merten's services, Banaitis filed a lawsuit against Mitsubishi Bank and the Bank of California in the Multnomah County Circuit Court for the State of Oregon. In his fourth amended complaint, Banaitis brought two claims for relief seeking general and punitive damages, one claim against Mitsubishi Bank and the other against the Bank of California. Banaitis alleged that Mitsubishi Bank intentionally and willfully interfered with Banaitis' employment agreement and economic expectations and caused the Bank of California to discharge Banaitis. Banaitis alleged that Bank of California wrongfully discharged him and improperly attempted to force him to breach his fiduciary duty to his customers by appropriating trade secrets and other confidential information.

On February 25, 1991, the state court empaneled a jury to try Banaitis' case. Approximately three weeks later, the jury retired for deliberations, returning a special verdict within four hours, finding that:

- Banaitis did not voluntarily resign his position;
- Mitsubishi Bank, through "improper means or ... motive," caused the Bank of California to fire or to discharge Banaitis constructively;
- The Bank of California forced Banaitis to resign by making his working conditions unacceptable, doing so because Banaitis refused to give confidential information to Mitsubishi Bank;
- Banaitis' refusal to give confidential information reflected an "important public policy";
- As a result of the tortious acts, Banaitis suffered emotional distress and injury to reputation;

- Banaitis was entitled to a damage award of $196,389 for lost compensation, $450,000 for lost future compensation, "noneconomic" damages (i.e., damages attributable to his "emotional distress and/or injury to reputation") of $500,000 against Mitsubishi Bank and $125,000 against the Bank of California, and punitive damages of $3 million against Mitsubishi Bank and $2 million against the Bank of California;
- Mitsubishi Bank was 80% at fault for the damages with the Bank of California 20% at fault, but the defendants were jointly and severally liable for the economic damage award and severally liable for the noneconomic and punitive damages awarded.

Soon after the jury returned its special verdict, Mitsubishi Bank and the Bank of California filed a motion with the trial court for judgment notwithstanding the verdict. The trial court granted this motion in part, setting aside the punitive damage award against each defendant. Both parties subsequently sought review with the Oregon Court of Appeals.

Before proceeding with this appeal, Banaitis and Merten entered a second fee agreement to confirm the terms of their arrangement for costs and fees incurred during the course of appellate litigation. In general terms, the new fee agreement provided that Merton would be entitled to 50% of all payable compensatory damages and 42.9127263% of all payable punitive damages.

The Oregon Court of Appeals decided entirely in Banaitis' favor, affirming the award of compensatory damages and reversing the trial court's judgment notwithstanding the verdict to the extent that it erased the jury's punitive damage award. *See Banaitis v. Mitsubishi Bank, Ltd.,* 129 Or.App. 371, 879 P.2d 1288 (1994). In response, Mitsubishi Bank and the Bank of

California appealed to the Oregon Supreme Court. The Oregon Supreme Court initially granted review, *see Banaitis v. Mitsubishi Bank, Ltd.,* 320 Or. 407, 887 P.2d 791 (1994), but, on August 24, 1995, the court dismissed this review as improvidently granted. *See Banaitis v. Mitsubishi Bank, Ltd.,* 321 Or. 511, 900 P.2d 508 (1995) (noting that two justices voted against dismissal).

Shortly thereafter, the parties entered into a confidential settlement agreement to resolve all pending disputes. As a part of this settlement agreement, Mitsubishi Bank and the Bank of California issued checks totaling $8,728,559, $3,864,012 of which the Bank of California paid, pursuant to the terms of the agreement, directly to Merten. Mitsubishi remitted the remaining $4,864,547 directly to Banaitis.[1]

Banaitis submitted a timely 1995 Federal income tax return as a married person filing separately. In his 1995 return, Banaitis reported a total income of $1,473,685, most of which constituted what Banaitis deemed "taxable interest"; in his return, importantly, Banaitis excluded from his gross income the full predicate $8,728,599 settlement total. To justify this gross income amount, Banaitis appended to his return "a disclosure statement ... explaining that the compensatory damages, the punitive damages, and the interest on the part of the award used to pay his attorney's fees were excludable from his gross income under section 104(a)(2)" of the Internal Revenue Code.

The Internal Revenue Service (hereinafter "the IRS" or "the Commissioner") disagreed with both the return as filed and the justifications set forth in Banaitis' explanatory "disclosure statement," delivering to Banaitis on March 24, 2000, a notice of deficiency regarding Banaitis' 1995 income tax payment. In pertinent part, the notice explained that the taxable proceeds of Banaitis' 1995 settlement with Mitsubishi and the Bank totaled $8,103,559, not the $1,421,420 that Banaitis reported; thus, Banaitis' taxable income grew by a measure of $6,682,130. Based on this substantially larger taxable income total, the IRS recalculated Banaitis' allowable miscellaneous itemized deduction, permitting a deduction of $3,317,516 and shifting Banaitis' allowable itemized deduction from $3,325,379 to $3,105,811, thus increasing Banaitis' taxable income by $219,568. The IRS also recalculated Banaitis' alternative minimum tax exposure, raising Banaitis' alternative minimum tax liability from $0 to $288,798. Application of the alternative minimum tax resulted, in effect, taxing the portion of Banaitis's gross income that was paid to his lawyers, even though he was able to deduct the same amount as a miscellaneous itemized deduction and thereby reduce his taxable income by that amount. The effect of the alternative minimum tax, under such circumstances, is to reduce or eliminate the expense deduction. With deductions and additions then fully recalculated and incorporated, the deficiency notice concluded that Banaitis owed an additional $1,708,216 in 1995 income tax.

Banaitis promptly filed a petition with the United States Tax Court seeking a redetermination of the deficiency. *See* 26 U.S.C. § 6213(a) (1999). Banaitis claimed that the full amount of the settlement pro-

---

**1.** Oregon law requires recipients of punitive damage awards to contribute a portion of such awards to the State. *See* Or.Rev.Stat. § 18.540 (1991). In a letter dated March 7, 1996, Banaitis contested the applicability of the statute to his award, seeking "written confirmation ... that the State of Oregon [would make] no claim under ORS 18.540 to any monies in this case." The State of Oregon refused to provide such "confirmation," and, sometime later, Banaitis agreed to pay $150,000 to the State. Merten paid none of his $3,864,012 to the State.

ceeds was properly excluded from gross income under 26 U.S.C. § 104(a)(2); that the amounts paid directly to Merten should similarly be excluded; and that his rights under the Fifth and Fourteenth Amendment had been violated.

The Tax Court found in favor of the IRS in all respects. It concluded that Banaitis was not entitled to exclude economic damages, punitive damages, or attorneys fees from his reported gross income and that his constitutional rights had not been infringed. Banaitis filed a timely notice of appeal.

■ We have jurisdiction under 26 U.S.C. § 7482(a)(1) (1999). We review the conclusions of the tax court *de novo, DHL Corp. v. Commissioner,* 285 F.3d 1210, 1216 (9th Cir.2002), both with regard to that court's interpretation of the tax code and corresponding treasury regulations, *id.,* and with regard to whether a particular tax burden violates the United States Constitution. *See Louis v. Commissioner,* 170 F.3d 1232, 1234 (9th Cir.1999).

## II

■ The Tax Court correctly held that the portions of the settlement representing economic and punitive damages were to be included in the taxpayer's gross income. Set forth in 26 U.S.C. § 61(a), the definition of "gross income" is broad: "Except as otherwise provided . . ., gross income means all income from whatever source derived." The Supreme Court has long reiterated the "sweeping scope" of § 61, *see Commissioner v. Schleier,* 515 U.S. 323, 327–28, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995) (quoting *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 429, 75 S.Ct. 473, 99 L.Ed. 483 (1955)); *see also United States v. Burke,* 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) ("The definition of gross income under the Internal Revenue Code sweeps broadly."), and, as a corollary to this liberal construction,

the Supreme Court has repeatedly "emphasized" the "default rule of statutory interpretation that exclusions from income must be narrowly construed." *Schleier,* 515 U.S. at 328, 115 S.Ct. 2159 (internal quotation marks omitted) (citing *Burke,* 504 U.S. at 248, 112 S.Ct. 1867 (Souter, J., concurring) & 244 (Scalia, J., concurring)); *United States v. Centennial Sav. Bank FSB,* 499 U.S. 573, 583, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991); *Commissioner v. Jacobson,* 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949).

Under § 104(a)(2) of the revenue code, taxpayers may exclude from gross income "the amount of any damages received . . . on account of personal injuries or sickness." 26 U.S.C. § 104(a)(2). The general theory of this exclusion is that "the damage award amounts to a forced sale of the plaintiff's good health, and people who are not forced to sell their good health never have to pay tax on its value." B. Bittker, Fed. Inc. Tax'n of Indiv. ¶ 7.03[1], 2003 ed. Supp. 1(x).

■ Section 104(a)(2) erects a bipartite test for exclusion of damages from gross income. To merit § 104(a)(2)'s exclusion, (1) the underlying claim must be "based on tort or tort type rights," and (2) "the amount of any damages received . . . [must be granted] on account of personal injury or sickness." 26 C.F.R. § 1.104–1(c) (1999); *see also Schleier,* 515 U.S. at 336–37, 115 S.Ct. 2159. The test's two elements are "independent[ly]" considered and are not coextensive. *Id.* at 333–36, 115 S.Ct. 2159."The regulatory requirement that the amount be received in a tort type action is not a substitute for the statutory requirement that the amount be received 'on account of personal injury or sickness'; it is an additional requirement." *Id.* at 333, 115 S.Ct. 2159. Neither the "economic" damage portion nor the punitive damage portion of Banaitis' settlement

recovery satisfy both aspects of this conjunctive test. *See* 26 C.F.R. § 1.104–1(c) (1999); *Schleier,* 515 U.S. at 336–37, 115 S.Ct. 2159.

In the case at hand, there is no doubt that Banaitis' underlying claims were founded in tort theory. The Supreme Court has endorsed a broad construction of "tort," emphasizing the remedial principles inherent in the cause of action and looking to relevant state law for guidance. *Burke,* 504 U.S. at 234–36, 112 S.Ct. 1867. In this case, we need not speculate about the tort-like nature of the claims underpinning Banaitis' award, for the Oregon state courts construed Banaitis' claims as sounding in tort. *Banaitis v. Mitsubishi Bank, Ltd.,* 129 Or.App. 371, 879 P.2d 1288, 1299–1300 (1994). Banaitis thus satisfies the first prong of § 104(a)(2)'s conjunctive test.

But because economic and punitive damages were not awarded "on account of" his personal injuries, Banaitis fails to satisfy the second requirement of § 104(a)(2)'s conjunctive test. The Supreme Court has construed § 104(a)(2) to require that the damage award be more than only proximately caused by the tortious conduct; it must also be directly causally related to personal injuries. *See Schleier,* 515 U.S. at 329–30, 115 S.Ct. 2159. In the ordinary personal injury tort action, these damages are relatively easily discerned: The tortious act causes personal injuries which, in turn, cause further damages, such as economic loss due to physical inability to work. Thus, in the paradigmatic personal injury case, both non-pecuniary damages (such as pain and suffering) and economic damages (such as wage loss, diminished work capacity, etc.) may be excluded from gross income because the losses are "on account of" personal injury.

So-called economic or commercial tort actions present a different circumstance, however. In such economic or commercial tort cases, economic damages are often caused solely by the tortious action itself, rather than as a consequence of personal injury. For example, in the typical wrongful discharge lawsuit, wage loss is typically caused by the tortious employment termination, not by any physical injury that may also have been caused by the wrongful discharge.

Banaitis urges a different construction of § 104(a)(2). He contends that the section allows a taxpayer to exclude all damages suffered in a personal injury action, which in turn, he construes to mean a tort suit like his own. Banaitis' construction misconstrues and conflates the two independent prongs of § 104(a)(2), doing so in a manner inconsistent with the Supreme Court's analysis in *Schleier.* Had Congress intended for all tort damages to be excluded—or excludable—from gross income, it could have easily and plainly said so. But Congress chose to employ § 104(a)(2)'s conjunctive requirement instead, demanding that the action sound in tort *and* that the damages recovered be "on account of" personal injury. *See* 26 U.S.C. § 104(a)(2). As *Schleier* makes clear, the second part of the test can only be satisfied if there is "a direct causal link" between the damages and the personal injuries sustained. *See Fabry v. Commissioner,* 223 F.3d 1261, 1270 (11th Cir.2000). Particularly in economic tort cases such as this, the "direct causal link" question requires a fact-specific analysis of the damage award.

In this case, it is clear that the economic and punitive damages were not causally related to Banaitis' alleged personal injuries. The personal injuries Banaitis alleges (e.g., headaches, insomnia, gastrointestinal disorders, bleeding gums, and back aches) did not cause his wage loss. Rather, his wage loss was caused by Bank of California's improper termination of his

employment and Mitsubishi Bank's interference with his employment relationship. Likewise, the punitive damage award was not causally related to his personal injuries; rather, it was predicated on the defendants' tortious conduct. Thus, the Tax Court properly concluded that Banatis' economic and punitive damage awards should have been included in his gross income in the relevant tax year.

### III

■■■ The Tax Court erred in holding that the attorneys fees paid to Merten should be included in Banaitis' gross income total. The question of whether attorneys fees paid under a contingent fee contract with a plaintiff are includable in the plaintiff's gross income involves two related questions: (1) how state law defines the attorney's rights in the action, and (2) how federal tax law operates in light of this state law definition of interests. *See United States v. Mitchell*, 403 U.S. 190, 197, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971) (noting that state law creates or defines the legal interests and property rights but that federal law defines when and how these interests and rights are taxed). The rationale of this two-part test is grounded on the long standing tax principle that one cannot escape tax liability through the assignment to another of income not yet received. *See Helvering v. Horst*, 311 U.S. 112, 114, 61 S.Ct. 144, 85 L.Ed. 75 (1940) (refusing to permit a taxpayer to escape tax liability through the anticipatory assignment of money due); *Lucas v. Earl*, 281 U.S. 111, 114–15, 50 S.Ct. 241, 74 L.Ed. 731 (1930) (refusing to allow a taxpayer to escape taxes through "anticipatory arrangements and contracts however skillfully devised to prevent the [income] ... from vesting even for a second in the [one] who earned it"). As a rule, plaintiffs cannot avoid the tax consequences of a personal injury judgment or settlement through an anticipatory assignment of a portion of the proceeds to their attorneys in payment of a contingent fee.

In certain contexts, however, state law may operate to provide the plaintiff's attorney greater rights than the lawyer would have under a contingent fee contract. As a result, we must examine applicable state law to determine whether the plaintiff's attorneys have particular property interests arising as a matter of law in the judgment or settlement independent of the fee contract. Using this state-law-specific analysis, we have concluded that, under Alaska law, attorneys fees contingent upon recovery are to be included in the plaintiff's gross income. *See Coady v. Commissioner*, 213 F.3d 1187, 1190–91 (9th Cir.2000). Significant to our decision in *Coady* was the fact that "under Alaska law, attorneys do not have a superior lien or ownership interest in the cause of action." *Id.* at 1190. The relevant Alaska statute, we noted, "does not confer any ownership interest upon attorneys or grant attorneys any right and power over the suits, judgments, or decrees of their clients." *Id.* (citing *Hagans, Brown & Gibbs v. First Nat. Bank of Anchorage*, 783 P.2d 1164, 1168 (Alaska 1989)). Not long ago, we reached a similar conclusion about the operation of California law, holding contingent attorneys fees includable in the plaintiff's gross income. *Benci–Woodward v. Commissioner*, 219 F.3d 941, 943 (9th Cir.2000), *cert. denied*, 531 U.S. 1112, 121 S.Ct. 855, 148 L.Ed.2d 770 (2001). Other circuits have reached similar conclusions in analyzing applicable law. *Young v. Commissioner*, 240 F.3d 369, 377–79 (4th Cir.2001); *Kenseth v. Commissioner*, 259 F.3d 881, 884–85 (7th Cir.2001); *Campbell v. Commissioner*, 274 F.3d 1312, 1313–14 (10th Cir.2001); *Baylin v. United States*, 43 F.3d 1451, 1454 (Fed.Cir.1995); *O'Brien v. Commissioner*, 319 F.2d 532 (3d Cir.1963).

Some circuits, of course, have reached contrary conclusions based on the unique features of applicable state law. In *Cotnam v. Commissioner*, 263 F.2d 119 (5th Cir.1959), for example, the Fifth Circuit concluded that contingent fees paid directly to one party's attorney by a separate party did not, under Alabama law, constitute a part of the first party's gross income. Its rationale was that the germane portion of the Alabama Code: (1) invested attorneys with "a lien superior to all liens but tax liens" in suits, judgments, and decrees for money, (2) mandated that "no person shall be at liberty to satisfy said suit, judgment or decree, until the lien or claim of the attorney for his fees is fully satisfied," and (3) determined that "attorneys at law shall have the same right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them." *Id.* at 125 & n. 5 (citing 46 Al.Code § 64(2) (1940)). The Fifth Circuit has reached a similar conclusion about the operation of Texas law. *See Srivastava v. Commissioner*, 220 F.3d 353, 355–57, 364–65 (5th Cir.2000) (relying on *Cotnam's* logic to conclude that "contingent fees paid according to Texas law are ... excludable"); *see also Foster v. United States*, 249 F.3d 1275, 1278 (11th Cir.2001) (extending *Cotnam's* Alabama-law-based holding into the law of the entire Eleventh circuit). And the Sixth Circuit has concluded that Michigan law vests attorneys with sufficient property interests in judgments such that contingent attorneys fees are properly excludable from the plaintiff's gross income. *See Estate of Clarks v. United States*, 202 F.3d 854, 856 (6th Cir.2000) (following *Cotnam* because Michigan's common law lien "operates in more or less the same way as the Alabama lien in *Cotnam* ").

In pertinent part, Oregon law is unlike the laws of California and Alaska. In pertinent part, in fact, Oregon law mirrors Alabama law in that it affords attorneys generous property interests in judgments and settlements. Unlike California and Alaska law, an attorney's lien in Oregon is "superior to all other liens" except "tax liens." O.R.S. § 87.490. Under Oregon law, "a party to the action, suit or proceeding, or any other person, does not have the right to satisfy the lien ... or any judgment, decree, order or award entered in the action, suit or proceeding until the lien, and claim of the attorney for fees based thereon, is satisfied in full." O.R.S. § 87.475. And Oregon law, like Alabama law, provides that attorneys shall have "the same right and power over actions, suits, proceedings, judgments, decrees, orders and awards to enforce their liens as their clients have for the amount of judgment due thereon to them." O.R.S. § 87.480. Indeed, Alabama and Oregon law are almost identical in their treatment of the interest attorneys have in legal actions.

In some respects, in fact, Oregon goes even further than does the Alabama law at issue in *Cotnam*. As the Oregon Supreme Court stated in *Potter v. Schlesser Co.*, 335 Or. 209, 63 P.3d 1172, 1174 (2003):

> The lien is a charge on the action, and the parties to the action cannot extinguish or affect the attorney's lien by any means (such as settlement) other than by satisfying the underlying claim of the attorney for the fees incurred in connection with the action.

The Oregon Supreme Court, thus, has recognized that an attorney has a right to sue a third party for attorneys fees that were left unsatisfied by a private settlement with the attorney's clients. *Id.* at 215, 63 P.3d 1172. In this sense, the case *sub judice* presents a different issue than the one we discussed in *Sinyard v. Commissioner*, 268 F.3d 756 (9th Cir.2001), in which we held that a third party's discharge of a debt held by a particular plain-

tiff constituted income to the plaintiff. *Id.* at 758–59. Put simply, Oregon law vests attorneys with property interests that cannot be extinguished or discharged by the parties to the action except by payment to the attorney; as a result, Banaitis' claim under Oregon law is akin to—and even stronger than—the claim in *Cotnam.*

Because of the unique features of Oregon law, we conclude that fees paid directly to Merten were not includable in Banaitis' gross income for the relevant year. Accordingly, we reverse the judgment of the Tax Court on this question.

## IV

■ Banaitis also claims that the application of the alternative minimum tax in this case violates his right to due process because it operates to "nullify" the outcome of his jury trial. Banaitis' alternative minimum tax theory is not a novel one, and we have previously considered and rejected this legal argument. *See, e.g., Benci–Woodward,* 219 F.3d at 944; *Weiser v. United States,* 959 F.2d 146, 148–49 (9th Cir.1992); *Okin v. Commissioner,* 808 F.2d 1338, 1342 (9th Cir.1987). We likewise reject it here.

## V

We affirm the judgment of the Tax Court that the economic and punitive damage awards are includable in gross income and that the alternative minimum tax was constitutionally applied in this case. We reverse the judgment of the Tax Court as to the inclusion of attorneys fees in the taxpayer's gross income.

**AFFIRMED IN PART; REVERSED IN PART.**