328 P.3d 320

**Patrick LOPEZ, Petitioner/Plaintiff–Appellant,**

v.

**STATE of Hawai'i, Respondent/Defendant–Appellee.**

**No. SCWC–11–0000512.**

Supreme Court of Hawai'i.

Feb. 12, 2014.

Eric A. Seitz, Honolulu, for petitioner.

Kimberly Tsumoto Guidry, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and POLLACK, JJ., and Circuit Judge LEE, in place of McKENNA, J., Recused, with ACOBA, J., dissenting separately.

1. The Honorable Patrick W. Border presided.

Opinion of the Court by
RECKTENWALD, C.J.

This appeal requires us to consider whether a lien recorded by the Child Support Enforcement Agency (CSEA) for unpaid child support has priority over an attorney's lien established for payment of fees in an unrelated, subsequently filed action. In 1997, the CSEA recorded a statutory lien on Patrick Lopez's real and personal property for delinquent child support. More than a decade later, on June 30, 2008, Lopez entered into a contingency agreement with the law firm of Eric A. Seitz for legal representation in an unrelated civil action for personal injury. Under the agreement, Seitz's law firm was to receive one-third of any recovery obtained. Seitz's law firm filed a personal injury action on behalf of Lopez against the State, which resulted in a $9,000 arbitration award in Lopez's favor. A dispute then arose between the State and Seitz's law firm as to whether the 1997 CSEA lien, which amounted to more than $9,000, had priority over Seitz's attorney's lien.

Lopez requested that the circuit court order the State to, inter alia, "make full payment" of the arbitration award. Seitz asserted that his interest in fees was distinct from any lien on Lopez's property. In opposition, the State argued that Hawai'i Revised Statutes (HRS) § 576D–10.5, which governs CSEA liens, provides that CSEA liens have priority over all other liens except for tax liens. The State also argued that HRS § 507–81, which governs attorney's liens, provides that an attorney's lien is established after commencement of the action; thus, because Lopez's action commenced after the CSEA lien was recorded, the CSEA lien has priority. The circuit court ruled that the CSEA's statutory lien had priority over Lopez's attorneys' lien and denied Lopez's motion.[1]

Lopez appealed, arguing that the circuit court erred in denying his motion because his attorneys' lien constitutes a property interest that is independent from Lopez's interest in the judgment, and that thus, equitable and

public policy considerations favor giving an attorney's lien priority over the CSEA's lien. The Intermediate Court of Appeals (ICA) affirmed the circuit court's order. *Lopez v. State*, No. CAAP–11–0000512, 128 Hawai'i 497, 2012 WL 5520465, at *2 (Haw.App. Nov. 13, 2012).

For the reasons set forth below, we hold that HRS § 507–81 does not provide a superior or independent right for an attorney's property interest in a judgment over a prior recorded CSEA lien. Accordingly, we affirm the ICA's December 12, 2012 judgment.

## I. Background

The following factual background is taken from the record on appeal.

### A. CSEA and Attorney's Liens

On August 20, 1997, the Office of Child Support Hearings of the State Department of the Attorney General filed an administrative order in the Family Court of the First Circuit stating that Lopez owed $17,964 in child support debt. The administrative order was filed in the state Bureau of Conveyances on September 15, 1997. Thus, a CSEA lien was placed on Lopez's real and personal property. *See* HRS § 576D–10.5.[2]

On June 30, 2008, Lopez entered into a contingency agreement with Seitz's law firm for legal representation in a civil action for personal injury. The agreement stated that Seitz's law firm would receive one-third of any recovery obtained, and provided that the firm "is given a lien for its fees, costs, and expenses upon any judgment or settlement

and is authorized to deduct such fees, costs, and expenses therefrom and to pay the balance to [Lopez]."

On July 13, 2009, Seitz's law firm filed a complaint on behalf of Lopez against the State for injuries Lopez allegedly suffered during his incarceration at the Halawa Correctional Facility. In addition to damages, Lopez sought "reimbursement of his costs and expenses herein, including reasonable provision for his attorneys' fees[.]"

On May 18, 2010, the CSEA notified Seitz that it was asserting its 1997 lien on Lopez's property and that the lien amount was $23,969.99 as of April 30, 2010:

In accordance with HRS § 576D–10.5, the CSEA hereby asserts its statutory lien upon all of Lopez's personal and real property including any settlement or other funds which you are now holding or will be holding in the future for Lopez, to be applied against Lopez's child support arrears.

. . . .

The CSEA has learned that Lopez may be receiving an award of funds in the captioned litigation. The CSEA requires that you pay any such funds or property due to him pursuant to CSEA's lien up to the amount owing of $23,969.99, which may be subject to change, pursuant to HRS § 576D–10.5.

Lopez's civil action was placed in the Court Annexed Arbitration Program, and on August 10, 2010, an arbitrator found that Lopez was entitled to damages in the amount of

---

**2.** HRS § 576D–10.5 (Supp.1997) provided, in relevant part:

(a) Whenever any obligor through judicial or administrative process in this State or any other state has been ordered to pay an allowance for the support, maintenance, or education of a child, or for the support and maintenance of a spouse or former spouse in conjunction with child support, and the obligor becomes delinquent in those payments, a lien shall arise on the obligor's real and personal property and the obligor's real and personal property shall be subject to foreclosure, distraint, seizure and sale, or order to withhold and deliver, which shall be executed in accordance with applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.

. . . .

(c) The child support order or judgment filed through judicial or administrative proceedings in this State or any other state shall be recorded in the bureau of conveyances. The recordation of the order or judgment in the bureau of conveyances shall be deemed, at such time, for all purposes and without any further action, to procure a lien on land registered in the land court under chapter 501. <u>The lien shall become effective immediately upon recordation of the child support order and shall attach to all interests in real or personal property then owned or subsequently acquired by the obligor</u> including any interests not recorded with the bureau of conveyances or filed in the land court.

(Emphasis added).

$9,000 but did not award Lopez any costs.[3] On September 9, 2010, the arbitrator's award in favor of Lopez and against the State was entered as final judgment in the case. According to Seitz, Seitz's law firm and the State then exchanged letters between September 2010 and December 2010 expressing their opposing views regarding the priority of the CSEA's lien and the attorney's lien.

## B. Circuit Court Proceedings

On January 14, 2011, Lopez filed a Motion for Issuance of Writ of Execution/Mandamus pursuant to Hawai'i Rules of Civil Procedure Rule 69. The motion requested that the circuit court "command[ ] [the State] to make full payment of the judgment entered herein on September 9, 2010 plus interest, and award [Lopez] his attorneys fees and costs for bringing this motion, or to appear before [the] Court and show cause why [the State] has not done so." [4]

On March 9, 2011, the State filed a memorandum in opposition to Lopez's motion. The State noted that resolution of Lopez's motion turned on interpretation of HRS §§ 507–81 [5] and 576D–10.5.[6] The State ar-

---

3. In a blank entitled "To Plaintiff" under the "Costs to Prevailing Party" section of the arbitration award document, the arbitrator filled in "$0.00."

4. Based on Seitz's affidavit attached to the motion, it appears that Lopez's motion was brought against the State in its capacity as a judgment debtor in the case rather than as a CSEA lienholder.

5. HRS § 507–81 (2006) provides:
 (a) An attorney has a lien upon:
 (1) Actions, suits, and proceedings after commencement of the action;
 (2) Judgments, decrees, orders, settlements, and awards entered by the court in favor of the client; and
 (3) Any proceeds paid in satisfaction of the judgment, decree, order, settlement, or award.
 (b) The lien shall be for:
 (1) The fees and compensation specifically agreed upon with the client;
 (2) The reasonable value of the services of the attorney, if there is no fee agreement;
 (3) Any costs advanced by the attorney; and
 (4) Any fees or commissions taxed or allowed by the court.
 (c) Except for tax liens, prior liens of record on the real and personal property subject to the lien created by this section, and as provided in section (d), the attorney's lien is superior to all other liens.
 (d) When the attorney's lien attaches to a judgment, settlement, or decree allowing or enforcing a client's lien, the attorney's lien has the same priority as the client's lien with regard to personal or real property subject to the client's lien.
 (e) The attorney's lien on a judgment, decree, order, settlement, or award remains valid as long as the judgment, decree, order, settlement, or award remains valid.
 (f) To be enforceable under this section, a notice of claim of attorney's lien shall be filed:
 (1) Before the complaint is dismissed by stipulation;
 (2) Before the complaint is dismissed by order of the court; or

 (3) Not later than one year after entry of final judgment is filed and disposition of any appeal thereof.
 (g) Except as provided by subsections (i) and (j), the attorney's lien is not affected by a settlement between the parties to the action, suit, or proceeding before or after the judgment, decree, order, or award.
 (h) Except as provided by subsections (i) and (j), a party to the action, suit, or proceeding or any other person shall not have the right to discharge or dismiss any judgment, decree, settlement, or award entered in the action, suit, or proceeding until the lien and claim of the attorney for fees based thereon is satisfied in full.
 (i) A judgment debtor may pay the full amount of a judgment or decree into court, and the clerk of the court shall thereupon fully satisfy the judgment or decree on the record, and the judgment debtor shall be thereby released from any further claims thereunder.
 (j) If more than one attorney from the same firm appears of record for a party, the satisfaction of the lien created by this section by one of the attorneys is conclusive evidence that the lien is fully satisfied.
 (k) Attorneys have the same right and power over actions, suits, proceedings, judgments, decrees, orders, settlements, and awards to enforce their liens as their clients have for the amount due thereon to them.
 (Emphases added).

6. HRS § 576D–10.5 (Supp.1997) provided:
 (a) Whenever any obligor through judicial or administrative process in this State or any other state has been ordered to pay an allowance for the support, maintenance, or education of a child, or for the support and maintenance of a spouse or former spouse in connection with child support, and the obligor becomes delinquent in those payments, a lien shall arise on the obligor's real and personal property and the obligor's real and personal property shall be subject to foreclosure, distraint, seizure and sale, or order to with-

gued that a plain reading of HRS § 576D–10.5 mandates priority of the CSEA lien over Lopez's attorneys' lien. The State also argued that, when HRS § 576D–10.5 is read with HRS § 507–81, "there is no question that CSEA liens have priority." The State contended that Lopez's "unrecorded attorney's lien" became effective in 2009, when Lopez's action commenced, and that the CSEA lien, which was recorded in September 1997, "clearly has priority over the attorney's lien." Finally, the State argued that to interpret HRS § 507–81 to give attorney's liens priority over CSEA liens would contravene public policy that favors parents supporting their children. The State asked the circuit court to deny Lopez's motion and "order that the State pay all judgment proceeds in this case directly to the [CSEA] to be applied to [Lopez's] outstanding child support obligation."

On March 14, 2011, the CSEA filed a Substantive Joinder in the State's opposition, stating that as of April 30, 2010, Lopez owed $23,969.99 in child support arrears, including $7,225.61 to the Mother, and $16,744.39 to

the State of Washington as reimbursement for welfare payments made by the State of Washington. The CSEA argued that its lien takes priority over Lopez's attorneys' claim for attorney's fees and costs "because the child support lien was recorded twelve (12) years before Lopez commenced the instant suit, and HRS § 576D–10.5 gives a child support lien priority over any claim or any unrecorded lien whenever acquired, except tax liens previously acquired." [7] The CSEA also discussed several circuit court orders in unrelated cases which held that CSEA recorded liens had priority over unrecorded attorney's liens. Finally, the CSEA argued that the CSEA lien should have priority over Lopez's attorney's fees as a matter of public policy.

In his reply, Lopez argued that the CSEA lien does not have priority over his attorneys' lien under HRS § 507–81 because the legislature intended HRS § 507–81 "to give attorneys their own property interest in a judgment for their compensation which is independent of the client's interest in the judgment[.]" Lopez also noted that HRS

hold and deliver, which shall be executed in accordance with applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.
(b) Whenever the dependents of the obligor receive public assistance moneys, the child support enforcement agency or its designated counsel may establish the public assistance debt through an appropriate judicial or administrative proceeding. Upon the establishment of the public assistance debt, it shall be subject to collection action, and the real and personal property of the obligor shall be subject to lien and foreclosure, distraint, seizure and sale, or order to withhold and deliver.
(c) The child support order or judgment filed through judicial or administrative proceedings in this State or any other state shall be recorded in the bureau of conveyances. The recordation of the order or judgment in the bureau of conveyances shall be deemed, at such time, for all purposes and without any further action, to procure a lien on land registered in the land court under chapter 501. The lien shall become effective immediately upon recordation of the child support order and shall attach to all interests in real or personal property then owned or subsequently acquired by the obligor including any interests not recorded with the bureau of conveyances or filed in the land court.
(d) No fee shall be charged the [CSEA] or its designated counsel for recording or filing of

the liens provided for in this section or for the recording or filing of any releases requested in conjunction with the liens.
(e) Any lien provided for by this section shall take priority over any lien subsequently acquired or recorded except tax liens.
(f) The lien shall be enforceable by the [CSEA] or its designated counsel or by the obligee by suit in the appropriate court or by bringing an action in an administrative tribunal or shall be enforceable as a claim against the estate of the obligor or by any lawful means of collection.
(g) The [CSEA], its designated counsel or the obligee, where appropriate, shall issue certificates of release upon satisfaction of the lien. Certificates of release of any real property shall be recorded in the bureau of conveyances or filed in the office of the assistant registrar of the land court. Recordation of the certificate of release shall be the responsibility of the obligor.
(Emphases added).

7. The reference to "any unrecorded lien whenever acquired" refers to a 2001 amendment to HRS § 576D–10.5, which is discussed infra. See 2001 Haw. Sess. Laws Act 95, § 1 at 174–76 (emphasis added). The 1997 version of the statute provided that any CSEA lien "shall take priority over any lien subsequently acquired or recorded except tax liens." HRS § 576D–10.5(e) (Supp. 1997) (emphasis added).

§§ 576D–10.5(a) and (b) provide that "a delinquency in child support payments gives rise to a lien only on the 'obligor's real and personal property.'" (Emphasis altered). Therefore, Lopez argued, the CSEA lien does not have priority over the attorney's lien, which attaches to the judgment independent from the "property" due to Lopez. Lopez also argued that until he filed the underlying action in 2009, there was no "personal property" that CSEA could have made subject to its lien when it was recorded in 1997. Accordingly, Lopez argued, the CSEA lien is not exempt from the general superiority of attorney's liens under HRS § 507–81(c), which provides, in relevant part, that "[e]xcept for ... prior liens of record on the real and personal property subject to the lien created by this section, ... the attorney's lien is superior to all other liens." Finally, Lopez argued that public policy favors giving attorney's liens priority over other liens "because it is often crucial for persons who may be judgment debtors to be able to retain legal counsel to obtain legal remedies to which they are entitled, and a client/debtor's ability to retain counsel may also accrue to the benefit of the client/debtor's creditors." (Citation omitted).

Following a hearing, the circuit court entered an order denying Lopez's motion. The order stated that "to be consistent, it will follow the prior rulings on this issue that ordered that the [CSEA's] statutory lien has priority over [Lopez's] counsel's lien for attorney's fees." The order also directed that the State hold the funds at issue pending the outcome of any appeal.

## C. ICA Appeal

Lopez timely filed a notice of appeal. Lopez raised a single point of error: The Circuit Court erred in denying [Lopez's] Motion for Issuance of Writ of Execution/Mandamus and concluding that the [CSEA's] statutory lien has priority over [Lopez's] counsel's lien for attorney's fees. Lopez argued that his attorneys' property interest in the underlying arbitration award is independent from Lopez's interest in the award. Therefore, Lopez argued, "equitable and public policy considerations favor affording greater priori-

ty to contractual attorney's liens over the [CSEA's] statutory liens." Lopez also argued that there are "sufficient ambiguities" in HRS §§ 507–81 and 576D–10.5 such that the circuit court should have considered those statutes in pari materia.

Lopez also argued that the circuit court's application of HRS § 576D–10.5 is unconstitutional and violates the due process rights afforded to Lopez's attorneys, as the attorney's lien represents his counsel's property. Specifically, Lopez argued, "[i]nasmuch as attorneys have a property interest in judgments awarded to their clients, then Article I, Section 5 of the Hawai'i State Constitution applies[.]" Lopez also argued that HRS § 576D–10.5 requires that enforcement of CSEA statutory liens "be subject to due process safeguards[.]" (Emphasis omitted).

Finally, Lopez argued that public policy and equitable considerations support a ruling that an attorney's lien has greater priority over the CSEA lien in this case. Lopez argued that it is "well-established public policy" that attorney's liens have priority over other judgment creditors' liens because it is "often crucial for persons who may be judgment debtors to be able to retain legal counsel to obtain legal remedies to which they are entitled." Lopez also argued that a judgment debtor's ability to retain legal representation may benefit judgment creditors such as the CSEA insofar as legal assistance may result in obtaining additional proceeds.

In a memorandum opinion, the ICA affirmed the circuit court's order denying Lopez's motion for writ of execution/mandamus. *Lopez*, 2012 WL 5520465, at *2. The ICA first stated that the language in HRS § 576D–10.5 governing CSEA liens is "not ambiguous, but clearly articulates the priority of child support liens over subsequent liens, other than tax liens." *Id.* at *1. The ICA noted that the CSEA recorded the child support lien in 1997, more than ten years before the attorney's lien arose. *Id.* at *2. Thus, the ICA held, the plain language of HRS § 576D–10.5 affords the CSEA lien superior priority over the subsequent attorney's lien. *Id.*

The ICA further stated that granting priority to the CSEA lien pursuant to HRS

§ 576D–10.5 is consistent with HRS § 507–81(c). *Id.* The ICA determined that the plain language of HRS § 507–81(c) gives a prior recorded lien such as the CSEA lien priority over a subsequent attorney's lien. *Id.* Finally, the ICA noted that contrary to Lopez's assertion that HRS § 507–81 creates a property interest for the attorney independent from the client, HRS § 507–81(k) provides that "[a]ttorneys have the same right and power over ... judgments ... and awards to enforce their liens as the clients have for the amount due thereon to them." *Id.* Therefore, the ICA held, HRS § 507–81 "does not provide a superior or separate right for an attorney, but grants the attorney the same right to the judgment as the client." *Id.* The ICA, thus, affirmed the circuit court's judgment. *Id.* The ICA subsequently entered its judgment on appeal on December 12, 2012.

Lopez timely filed an application for writ of certiorari, in which he raises the following questions:

1. Did the ICA gravely err in failing to apply the proper and well-established rules of statutory interpretation as enunciated in *Haole v. State*, 111 Hawai'i 144 [, 140 P.3d 377] (2006) ?

2. Did the ICA gravely err in concluding that the language in HRS § 576D–10.5 is not ambiguous?

3. Did the ICA gravely err in concluding that HRS § 507–81 does not provide a superior or separate right for an attorney's property interest in a judgment over a prior recorded lien?

The State timely filed its response.

## II. Standard of Review

 "Statutory interpretation is a question of law reviewable de novo." *Kaleikini v. Yoshioka*, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012) (quoting *First Ins. Co. of Hawai'i v. A & B Props., Inc.*, 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012)). It is well-established that the "fundamental starting point for statutory interpretation is the language of the statute itself." *First Ins. Co. of Hawai'i*, 126 Hawai'i at 414, 271 P.3d at 1173 (quoting *State v. Wheeler*, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)). "[W]here the statutory language is plain and unambiguous, our

sole duty is to give effect to its plain and obvious meaning." *Id.* Moreover, "implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Id.* "[W]hen there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists." *Id.*

## III. Discussion

### A. The CSEA lien takes priority over Lopez's attorney's lien

Lopez argues that the language in HRS § 576D–10.5 is ambiguous; specifically, he argues that subsections (a), (b), and (f) of the statute create an ambiguity as to what portions of a judgment are the property of the obligor, and as to what other "applicable state law[s]" govern the execution of CSEA's statutory liens. Lopez contends that because the statute is ambiguous, it must be construed in pari materia with HRS § 507–81, which, according to Lopez, gives attorneys a vested property interest in judgments. Therefore, Lopez argues, his attorneys' lien on the judgment is an interest separate from the judgment proceeds due to Lopez, the latter of which is subject to the CSEA lien. In other words, according to Lopez, the amount of the judgment due to the attorneys was never Lopez's property, and is thus not subject to a prior recorded lien.

Lopez's arguments lack merit. As an initial matter, HRS § 576D–10.5 is not ambiguous. When the CSEA established its lien against Lopez's property in 1997, HRS § 576D–10.5 (Supp.1997) provided, in relevant part:

(a) Whenever any obligor through judicial or administrative process in this State or any other state has been ordered to pay an allowance for the support, maintenance, or education of a child, or for the support and maintenance of a spouse or former spouse in conjunction with child support, and the obligor becomes delinquent in those payments, <u>a lien shall arise on the obligor's real and personal property and the obli-</u>

gor's real and personal property shall be subject to foreclosure, distraint, seizure and sale, or order to withhold and deliver, which shall be executed in accordance with applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.

. . . .

(c) The child support order or judgment filed through judicial or administrative proceedings in this State or any other state shall be recorded in the bureau of conveyances. The recordation of the order or judgment in the bureau of conveyances shall be deemed, at such time, for all purposes and without any further action, to procure a lien on land registered in the land court under chapter 501. The lien shall become effective immediately upon recordation of the child support order and shall attach to all interests in real or personal property then owned or subsequently acquired by the obligor including any interests not recorded with the bureau of conveyances or filed in the land court.

. . . .

(e) Any lien provided for by this section shall take priority over any lien subsequently acquired or recorded except tax liens.

(f) The lien shall be enforceable by the [CSEA] or its designated counsel or by the obligee by suit in the appropriate court or by bringing an action in an administrative tribunal or shall be enforceable as a claim against the estate of the obligor or by any lawful means of collection.

(Emphases added).

The statute was subsequently amended so that when the CSEA sought to enforce its lien on Lopez's judgment in 2010, sections (e) and (f) provided, in relevant part:

(e) A recorded order or judgment regarding child support or public assistance debt becomes effective and takes priority from the time it is recorded or the time the child support obligation described therein becomes delinquent, whichever is later. A statutory lien that is provided for by and becomes effective under this section shall take priority over any unrecorded lien whenever acquired, except tax liens previously acquired.

(f) A lien shall be enforceable by the child support enforcement agency or its designated counsel, [or] by the obligee . . . in the following manner:

(1) By suit in the appropriate court;

(2) By bringing an action in an administrative tribunal;

(3) By filing and serving a notice of child support lien; or

(4) By any lawful means of collection.

. . . .

Upon service of a notice of child support lien, the individual or entity served shall withhold the amount of the lien from the proceeds of any estate, judgment, settlement, compromise, vacation or holiday pay, or other benefits due the obligor and deliver the funds to the [CSEA] . . . . A notice of child support lien shall remain in effect until satisfied, extinguished, or released.

HRS § 576D–10.5(e) & (f) (2006 & Supp. 2010) (emphases added).

 HRS § 576D–10.5 clearly provides that a CSEA lien becomes effective when it is recorded, and that it attaches to all real and personal property then owned or subsequently acquired. The statute also unequivocally states that CSEA liens take priority over any subsequent liens, except for tax liens.

 Nevertheless, Lopez argues that HRS § 576D–10.5 is ambiguous because of language in, inter alia, subsection (f), which provides in part that "[u]pon service of a notice of child support lien, the individual or entity served shall withhold the amount of the lien from the proceeds of any . . . judgment . . . due the obligor and deliver the funds to the [CSEA]." (Emphasis added). Lopez suggests there is an ambiguity because "proceeds of any . . . judgment . . . due the obligor" could be interpreted to mean only proceeds of the judgment that the obligor is entitled to, to the exclusion of counsel's lien amount.

Lopez further contends that HRS § 576D–10.5 should be construed in pari materia with HRS § 507–81, which, Lopez suggests, pro-

vides his attorneys "a vested property interest in the judgment," and that therefore, the "attorney's lien attaches to the judgment, independently of the proceeds (i.e., the 'personal property') due to Mr. Lopez[.]" Thus, according to Lopez, his attorneys' interest in the judgment is not considered Lopez's "personal property" that is subject to the CSEA lien.

■ HRS § 507–81, however, does not contain language creating a property interest for the attorney separate from that of the client.[8] Lopez points to HRS § 507–81(a)(2), which provides that an attorney has a lien upon "[j]udgments ... and awards entered by the court in favor of the client[,]" and HRS § 507–81(b)(1), which provides that the attorney's lien shall be for "fees and compensation specifically agreed upon with the client[.]" Neither subsection grants attorneys a property interest independent from that of the client such that the attorney's share is secure from prior liens. Moreover, HRS § 507–81(c) is directly contrary to Lo-

pez's theory. HRS § 507–81(c) provides that an attorney's lien is superior to all other liens "[e]xcept for[,]" inter alia, "prior liens of record on the real and personal property subject to" the attorney's lien. Thus, the attorney's lien statute expressly provides that property attached by the attorney's lien is also subject to prior recorded liens. In other words, contrary to Lopez's contention, property that is subject to an attorney's lien does not become immune from other liens.

■ Moreover, HRS § 507–81 expressly provides for an attorney to have a "lien"— not an outright award—upon, inter alia, judgments, and proceeds paid in satisfaction of the judgment. *See* HRS §§ 507–81(a)(2)–(3). A "lien" is a "legal right or interest that a creditor has in another's property[.]" *Black's Law Dictionary* 1006 (9th ed. 2009) (emphasis added); *see also id.* (defining "attorney's lien" as "[t]he right of an attorney to hold or retain a client's money or property ... until the attorney's fees have been prop-

---

8. HRS § 507–81 provides:
(a) An attorney has a lien upon:
(1) Actions, suits, and proceedings after commencement of the action;
(2) Judgments, decrees, orders, settlements, and awards entered by the court in favor of the client; and
(3) Any proceeds paid in satisfaction of the judgment, decree, order, settlement, or award.
(b) The lien shall be for:
(1) The fees and compensation specifically agreed upon with the client;
(2) The reasonable value of the services of the attorney, if there is no fee agreement;
(3) Any costs advanced by the attorney; and
(4) Any fees or commissions taxed or allowed by the court.
(c) Except for tax liens, prior liens of record on the real and personal property subject to the lien created by this section, and as provided in section (d), the attorney's lien is superior to all other liens.
(d) When the attorney's lien attaches to a judgment, settlement, or decree allowing or enforcing a client's lien, the attorney's lien has the same priority as the client's lien with regard to personal or real property subject to the client's lien.
(e) The attorney's lien on a judgment, decree, order, settlement, or award remains valid as long as the judgment, decree, order, settlement, or award remains valid.
(f) To be enforceable under this section, a notice of claim of attorney's lien shall be filed:
(1) Before the complaint is dismissed by stipulation;
(2) Before the complaint is dismissed by order of the court; or
(3) Not later than one year after entry of final judgment is filed and disposition of any appeal thereof.
(g) Except as provided by subsections (i) and (j), the attorney's lien is not affected by a settlement between the parties to the action, suit, or proceeding before or after the judgment, decree, order, or award.
(h) Except as provided by subsections (i) and (j), a party to the action, suit, or proceeding or any other person shall not have the right to discharge or dismiss any judgment, decree, settlement, or award entered in the action, suit, or proceeding until the lien and claim of the attorney for fees based thereon is satisfied in full.
(i) A judgment debtor may pay the full amount of a judgment or decree into court, and the clerk of the court shall thereupon fully satisfy the judgment or decree on the record, and the judgment debtor shall be thereby released from any further claims thereunder.
(j) If more than one attorney from the same firm appears of record for a party, the satisfaction of the lien created by this section by one of the attorneys is conclusive evidence that the lien is fully satisfied.
(k) Attorneys have the same right and power over actions, suits, proceedings, judgments, decrees, orders, settlements, and awards to enforce their liens as their clients have for the amount due thereon to them.
(Emphases added).

erly determined and paid" (emphasis added)). Accordingly, a lien merely creates a right to another's property; it does not divide the property into distinct, independently-owned properties.

This conclusion is further supported by the provision in the attorney's lien statute that "[a]ttorneys have the same right and power over actions, suits, proceedings, judgments, decrees, orders, settlements, and awards to enforce their liens as their clients have for the amount due thereon to them." HRS § 507–81(k) (emphases added). Under the express terms of this provision, attorneys merely have a right to enforce their liens upon their clients' judgments and awards. Therefore, HRS § 507–81 does not create a superior or independent right for an attorney, but provides the attorney the same right to the judgment as the client. In sum, HRS § 507–81 does not grant attorneys a superior or separate right to their clients' property over a prior recorded lien.[9]

Simply stated, if the legislature intended to preclude attorney's liens on client judgments from becoming subject to CSEA liens, it could have expressly included such language in HRS § 576D–10.5 and HRS § 507–81. However, neither statute contains any such language. Instead, as stated above, HRS § 576D–10.5 provides that a CSEA statutory lien takes priority over any unrecorded lien except for tax liens, and HRS § 507–81(c) provides that property attached by the attorney's lien is subject to prior recorded liens. Because the CSEA recorded its lien in 1997, before Lopez's unrecorded attorney's lien arose, the CSEA lien takes priority over the attorney's lien.

Despite the plain language of the foregoing statutes, Lopez nonetheless argues that the legislative history of HRS § 507–81 dictates a contrary result. Lopez contends that the

legislative history demonstrates that lawmakers "clearly recognized attorneys' property interests in judgments as compensation for their services which is separate and independent from the client's or obligor's personal property interest in the judgment." Specifically, Lopez points to a 2004 House Judiciary Committee report that stated, inter alia, that the attorney's lien statute "clarifies that attorneys' liens on settlements and judgments vest attorneys with clear property interests, and those amounts should not be taxed to the client." H. Stand. Comm. Rep. No. 1016–04, in 2004 House Journal, at 1814.

By way of background, the purpose of the 2004 act was to "ensure that Hawai'i residents who receive nonphysical injury settlements or awards are not subject to double federal taxation." 2004 Haw. Sess. Laws Act 48, § 1 at 241 (emphasis added). Some federal courts had taken the position that the alternative minimum tax required that such awards be taxed in full to the injured party, without deducting any amounts recovered by their attorneys. Id. However, in Banaitis v. Commissioner of Internal Revenue, 340 F.3d 1074 (9th Cir.2003), the Ninth Circuit Court of Appeals, relying on an Oregon attorney's lien statute, ruled that "under Oregon law, court-ordered or contingent attorney fees are considered property of the attorney and not subject to double taxation." 2004 Haw. Sess. Laws Act 48, § 1 at 241. Accordingly, the Hawai'i legislature enacted Act 48, which was modeled on the Oregon attorneys' lien provisions that the Ninth Circuit relied on in Banaitis. Id.

In Banaitis, the Ninth Circuit noted that an attorney's lien in Oregon is "superior to all other liens" except "tax liens" and "vests attorneys with property interests that cannot be extinguished or discharged by the parties to the action except by payment to the attorney[.]"[10] 340 F.3d at 1082–83. Because the

9. Lopez's citation to *Rockwood Water District v. Steve Smith Contracting, Inc.,* 80 Or.App. 136, 720 P.2d 1332 (1986), is inapplicable. *Rockwood* turned on specific statutory language that led the Oregon court to interpret "personal property" to exclude money judgments, so that a third party's lien on a money judgment was subordinate to the attorney's lien. 720 P.2d at 1333–34. Here, Lopez does not point to, nor do there appear to be, any related statutes that define or otherwise lead to the conclusion that the term "personal proper-

ty" referenced in HRS §§ 576D–10.5 or 507–81 excludes money judgments. To the contrary, HRS § 576D–10.5(f) specifically includes proceeds of any judgment or settlement, and HRS § 507–81 does not contain language differentiating between money judgments, real property, or personal property.

10. In stating that Oregon law provides attorneys generous property interests in judgments, the

law "affords attorneys generous property interests in judgments and settlements[,]" the Ninth Circuit held that fees paid directly to attorneys out of the judgment were not considered gross income by the client.[11] *Id.* at 1082–83.

Lopez's reliance on the legislative history of Hawai'i's attorney's lien statute is unpersuasive. The statement in the House committee report that "attorneys' liens on settlements and judgments vest attorneys with clear property interests" for federal income tax purposes does not mean that the attorney has an exclusive property interest that is therefore not subject to any prior recorded liens. Again, the purpose of the attorney's liens legislation was to prevent the amount of attorney's fees paid out of a judgment from being taxed twice. H. Stand. Comm. Rep. No. 1016–04, in 2004 House Journal, at 1814. There is no language in HRS § 507–81 that supports Lopez's theory that attorneys' liens upon their clients' judgments may never be subject or subordinate to a prior lien. To the contrary, as stated above, the statute expressly provides for that result. *See* HRS

§ 507–81(c). Moreover, the legislature's use of the term "lien" in the statute and legislative committee reports implies its understanding that an attorney's property interest is a security interest that attaches to the client's property, rather than the literal transfer of ownership to the lienholder.

Accordingly, CSEA's lien takes priority over Lopez's attorneys' lien.

## B. Lopez's due process and policy arguments are unavailing

■ Lopez argued before the ICA that the circuit court's application of HRS § 576D–10.5 violated his attorneys' due process rights. Lopez also argued before the ICA and this court that the due process protections provided in HRS § 576D–10.5 as well as the language of HRS § 507–81 "suggest[ ] broadly that the [CSEA] lien might be subordinate to other claims and that questions of priority ought to be decided by reference to general principles of equity." (Quoting *Nicoletti v. Lizzoli,* 124 Cal.App.3d 361, 368, 177 Cal.Rptr. 685 (1981)).[12] It appears

---

*Banaitis* court quoted Oregon law as providing that: (1) an attorney's lien is "superior to all other liens" except "tax liens[,]" (2) "a party to the action, suit or proceeding, or any other person, does not have the right to satisfy the lien . . . or any judgment, decree, order or award entered in the action, suit or proceeding until the lien, and claim of the attorney for fees based thereon, is satisfied in full[,]" and (3) attorneys shall have "the same right and power over actions, suits, proceedings, judgments, decrees, orders and awards to enforce their liens as their clients have for the amount of judgment due thereon to them." 340 F.3d at 1082 (citations omitted).

Notably, HRS § 507–81 appears to differ in part from the Ninth Circuit's recitation of Oregon law because HRS § 507–81(c) provides that attorneys' liens are not superior to "prior liens of record on the real and personal property subject to" the attorneys' lien.

11. The United States Supreme Court subsequently reversed *Banaitis* for this very proposition. *Comm'r of Internal Revenue v. Banks,* 543 U.S. 426, 430, 125 S.Ct. 826, 160 L.Ed.2d 859 (2005). The Supreme Court's reasoning is instructive insofar as it clarified that the entire recovery in a lawsuit is considered income to the client. The Supreme Court reasoned in part that "[t]he attorney is an agent who is dutybound to act only in the interests of the principal [the client], and so it is appropriate to treat the full amount of the recovery as income to the principal." 543 U.S.

at 436, 125 S.Ct. 826. The Supreme Court further explained:

> The contingent-fee lawyer is not a joint owner of his client's claim in the legal sense any more than the commission salesman is a joint owner of his employer's accounts receivable. In both cases a principal relies on an agent to realize an economic gain, and the gain realized by the agent's efforts is income to the principal. The portion paid to the agent may be deductible, but absent some other provision of law it is not excludable from the principal's gross income. This rule applies whether or not the attorney-client contract or state law confers any special rights or protections on the attorney, so long as these protections do not alter the fundamental principal-agent character of the relationship.

*Id.* at 436–37, 125 S.Ct. 826 (quotation marks, citations, and brackets omitted).

12. To the extent that Lopez relies on *Nicoletti* for the proposition that issues of priority should be decided under equity principles, such reliance is misplaced. Reading the language that Lopez quotes from *Nicoletti* in context demonstrates that it is inapplicable. Indeed, the full sentence from which Lopez quotes in part is:

> Code of Civil Procedure section 688.1 [a lien statute] contains no language explicitly regulating priority, but the provisions that the judge 'may, in his discretion, order that the judgment

that Lopez argues, in other words, that constitutional and equitable considerations support an interpretation that an attorney's lien has priority over the CSEA's lien.

Lopez's constitutional arguments fail. Lopez articulates such "constitutional considerations" as follows:

> In crafting the statutory scheme that authorizes the CSEA to create and enforce its statutory liens under HRS § 576D–10.5, the Legislature recognized the constitutional property interests of attorneys in judgments and ensured that the collection procedures authorized by HRS § 576D–10.5 would be governed by due process safeguards. HRS § 576D–10.5(g) [13] requires that enforcement of CSEA's statutory liens "be subject to due process safeguards" including consideration by "an independent administrative or judicial tribunal."

(Emphasis omitted).

Lopez's contention lacks merit. First, the procedural "due process" safeguards that Lopez points to in HRS § 576D–10.5 serve to protect the due process rights of the CSEA's debtor. The statute does not indicate that the CSEA statute is intended to protect the rights of other lienholders such as attorneys. Moreover, as discussed *supra*, the attorney's lien statute does not grant an attorney ownership of a portion of the client's property.

Second, even assuming that the due process provisions apply to other lienholders, the record shows that Lopez and his attorneys were provided the procedural due process protections set forth in HRS § 576D–10.5(g). Lopez's attorneys had constructive notice of the CSEA lien insofar as the administrative order regarding Lopez's child support debt was filed in the Bureau of Conveyances before the attorneys entered into a contingency agreement with Lopez. The CSEA also notified Lopez's attorney that it was asserting a lien on Lopez's property. Lopez, through his attorneys, contested the action by filing the Motion for Issuance of Writ of Execution/Mandamus, and appealed the circuit court's decision regarding that motion on the record. Lopez and his attorneys clearly had notice and an opportunity to be heard.

■ Any "as applied" substantive due process claim would also lack merit.[14] "To establish an 'as applied' violation of substantive due process, an aggrieved person must prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *In re Applications of Herrick*, 82 Hawai'i 329, 349, 922 P.2d 942, 962 (1996). There is no evidence that the State's action was arbitrary or unreasonable. As established above, Lopez's counsel's interest is limited to a lien on

---

creditor be granted a lien' suggests broadly that the lien might be subordinate to other claims and that questions of priority ought to be decided by reference to general principles of equity.

*Nicoletti*, 124 Cal.App.3d at 368, 177 Cal.Rptr. 685.

In the instant case, neither the CSEA lien statute nor the attorney's lien statute provides for a judge's discretion, and, as stated above, both statutes expressly regulate priority of liens. *See* HRS § 576D–10.5; HRS § 507–81.

**13.** HRS § 576D–10.5 does not make any reference to attorneys' liens, although HRS § 576D–10.5(g) provides, in relevant part:

A lien shall be enforceable by the [CSEA] ... without the necessity of obtaining a court order in the following manner:

(1) By intercepting or seizing periodic or lump-sum payments from:

(A) A state or local agency, including unemployment compensation, and other benefits; and

(B) Judgments, settlements, and lotteries;

....

(2) By attaching and seizing assets of the obligor held in financial institutions;

(3) By attaching public and private retirement funds; and

(4) By imposing liens in accordance with this section and, in appropriate cases, to force the sale of property and distribution of proceeds. These procedures shall be subject to due process safeguards, including, as appropriate, requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal.

(Emphases added).

**14.** In his Reply brief before the ICA, Lopez clarified that he was "asserting both substantive and procedural due process rights of his attorneys in his challenge to HRS Section 576D–10.5 as applied by the State in this case."

the judgment; however, counsel never had a distinct and exclusive statutory interest in that judgment. With regard to the lien, as stated above, HRS § 507–81(c) clearly sets forth that attorney's liens are subordinate to, inter alia, prior recorded liens. HRS § 576D–10.5(e) also provides that a CSEA lien takes priority from the time it is recorded. Lopez's attorneys' lien arose more than a decade after the CSEA recorded its lien against Lopez's real and personal property, and is thus subordinate to the CSEA's lien. Lopez has not shown, nor does he even appear to allege, that the State's action has no relation to the public welfare. The State did not apply HRS § 576D–10.5 in a manner that was arbitrary and unreasonable, or in a manner that had no substantial relation to the public health, safety, morals, or general welfare. The challenged State action—the circuit court's application of the statutes—furthers the State's legitimate interest in obtaining money for child support because Lopez's arbitration award will go to CSEA to pay part of his outstanding child support obligations. Such an application is thus not "arbitrary."

 Lopez's policy arguments are also unavailing. First, because neither the language nor the legislative history of HRS § 576D–10.5 or HRS § 507–81 supports Lopez's theory that his attorneys' lien is superior to or otherwise exempt from the CSEA's lien, it would be improper for this court to rely on policy principles to reach a contrary interpretation. Indeed,

> [w]e cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. We do not legislate or make laws. Even when the court is convinced in its own mind that the [l]egislature really meant and intended something not expressed by the phraseology of the [a]ct, it has no authority to depart from the plain meaning of the language used.

*State v. Klie,* 116 Hawai'i 519, 525, 174 P.3d 358, 364 (2007) (quoting *State v. Sakamoto,* 101 Hawai'i 409, 413, 70 P.3d 635, 639 (2003)); *see also Ross v. Stouffer Hotel Co. Ltd., Inc.,* 76 Hawai'i 454, 467, 879 P.2d 1037, 1050 (1994) (Klein, J., concurring and dissenting)

("[W]e are not at liberty to interpret a statutory provision to further a policy that is not articulated in either the language of the statute or the relevant legislative history, even if we believe that such an interpretation would produce a more beneficent result, for '[t]he Court's function in the application and interpretation of such laws must be carefully limited to avoid encroaching on the power of [the legislature] to determine policies and make laws to carry them out.'" (citation omitted)); *State v. Harada,* 98 Hawai'i 18, 50, 41 P.3d 174, 206 (2002) (Acoba, J., concurring and dissenting) ("[N]either the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy when the legislature has clearly and unambiguously spoken." (quoting 1 N. Singer, *Sutherland Statutory Construction* § 3.06, at 55 (5th ed. 1992–94))).

Moreover, the cases that Lopez cites to support his policy and equitable considerations are distinguishable from the instant case. Several of the cases do not even concern competing lienholders, but rather involve whether an attorney who represented a parent in a child support action may recover fees from proceeds of the litigation. *See In re Marriage of Wageman,* 25 Kan.App.2d 682, 968 P.2d 1114, 1115–18 (1998) (holding, in a dispute between an attorney and his client, that in an action for recovery of unpaid child support, "the attorney for the claimant is entitled to an attorney's lien against the amount of settlement or judgment for fees incurred in obtaining the settlement or judgment"); *Eastmond v. Earl,* 912 P.2d 994, 995–96 (Utah Ct.App.1996) (holding that an attorney who represented a mother in a child support action under an agreement that the attorney was to receive a portion of collected delinquent child support was entitled to pursue the attorney's lien against the father); *Landry v. Roebuck,* 193 Mich.App. 431, 484 N.W.2d 402, 402–03 (1992) (resolving a dispute between attorneys and their client by holding that the attorneys who obtained increased child support for their client properly asserted a retaining lien on the proceeds of a check payable to the client for unpaid child support).

Lopez also cites cases where the attorney's lien was established before the judgment lien was created. *See All Points Capital Corp. v. Architectural Metal Products, Inc.*, No. C 08–04394 VRW, 2010 WL 1610013, at *3 (N.D.Cal. April 20, 2010) (finding that the attorney's lien was created nearly seven months before the plaintiff's judgment lien and thus had priority); *Cetenko v. United Calif. Bank*, 30 Cal.3d 528, 179 Cal.Rptr. 902, 638 P.2d 1299, 1303 (Cal.1982) (holding that the attorney's lien had priority because it was created several years before a third party was granted a lien). However, in the instant case, the CSEA lien was established before the attorney's lien arose, and Hawai'i statutes provide priority to the CSEA lien.[15]

Finally, Lopez cites *Pangborn Plumbing Corp. v. Carruthers & Skiffington*, 97 Cal. App.4th 1039, 119 Cal.Rptr.2d 416 (2002), for the proposition that "statutes governing determination of priority among liens 'simply reflect the equitable principle[s] that those whose labor, skills, and materials resulted in the creation of a fund should be entitled to priority in the payment of their claims from such source.'" The *Pangborn* court stated that an attorney's contractual lien over proceeds from litigation had priority over a creditor's judgment lien because a "contractual lien for attorney's fees, entered into before the client has succeeded in recovering any proceeds by way of litigation, is 'first in time' as to such potential proceeds" and "liens of other creditors ... reach only the debtor's interest in property, and are subject to prior equities against the debtor." *Id.* at 425. However, the court appeared to rely on a statutory scheme different from that outlined in HRS §§ 576D–10.5 and 507–81, and noted that the creditor did not file notice of its lien before the attorney's lien arose. *Id.* at 426. Here, as stated above, the CSEA filed notice of its lien, which statutorily attaches to any property then owned or subsequently acquired, years before Lopez entered into a fee agreement with his attorneys. *See* HRS § 576D–10.5(c) (Supp.1997).

In sum, the cases Lopez cites to support his argument that equitable considerations justify granting priority to his attorneys' lien are distinguishable from the instant case. In any event, Lopez's "equitable considerations" do not warrant interpreting the statutory scheme in a manner contrary to its plain language. Lopez argues, for example, that granting priority to attorneys' contractual liens ensures that judgment debtors will be able to retain counsel to obtain legal remedies to which they are entitled. Lopez also argues that a judgment debtor's ability to retain counsel benefits judgment creditors, because "counsel provide their labor and skills to create additional proceeds from which the judgment creditors' liens can be satisfied."

However, as the State notes, recognizing Lopez's equitable arguments could open the door to other potential lienholders making similar arguments. Such questions of policy are properly left to the legislature, particularly in the face of clear statutory language. Above all, while we are not unsympathetic to Lopez's concerns—which would only arise in cases where the CSEA lien amount exceeds the recovery—we are also bound to apply the statutory language established by the legislature, which has clearly spoken on this issue. *See Klie*, 116 Hawai'i at 525, 174 P.3d at 364 ("We cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts." (citation omitted)).

## IV. Conclusion

For the reasons set forth in this opinion, we affirm the ICA's judgment on appeal, which affirmed the circuit court's June 15, 2011 order.

Dissenting Opinion by ACOBA, J.

Statutes cannot conceive of every possible contingency, because it is in the nature of life that not all circumstances can be foreseen. Where a circumstance would not have plausibly been contemplated by the legislature, as judges, we are left to fill the gap between the

---

**15.** Although the dissent states that Lopez's counsel had a property interest in his fees, *see* dissenting opinion at 17–18, counsel's statutory property interest in any portion of the judgment would be subject to other liens under HRS § 576D–10.5 and HRS § 507–81.

statute and the unexpected event. In doing so, we must rely upon established notions of justice and thus strive for the result that is fair and balanced.

It is fair that an attorney, as should anyone else who performs work, be properly paid for his or her labor. The benefit of support flowing to the child in this case would not have existed but for the attorney's efforts. That the attorney should be fairly compensated and that the child should receive the product of the lawyer's effort strikes a true balance that is in the public interest and wholly consonant with established legal principles.

Under the majority's decision, counsel is deprived entirely of any compensation for the work he did and of reimbursement for advances he made to cover the costs of the suit that ultimately benefitted the child. That result is neither fair nor balanced. The outcome is not in the public interest or compelled by any constitutional principle. Therefore, I must respectfully dissent.

## I.

### A.

On June 30, 2008, the law firm of Eric A. Seitz (Seitz) entered into an attorney's contingency fee contract with Petitioner/Plaintiff-Appellant Patrick Lopez (Lopez). The contract provided that Seitz was entitled to one-third of any recovery and was entitled to assert a lien for that amount upon any judgment or settlement.[1]

On July 13, 2009, Seitz sued Respondent/Defendant-Appellee the State of Hawai'i (the State) on behalf of Lopez, in the circuit court of the first circuit[2] (the court). On May 18, 2010, the Child Support Enforcement Agency (CSEA) notified Seitz that due to Lopez's failure to pay child support, CSEA held a lien pursuant to HRS § 576D-10.5 (Supp.1997)[3] "upon all of Lopez's personal and real property including a settlement or other funds which you are now holding or will be holding in the future for Lopez." The lien, in the amount of $23,969.99, was recorded on September 15, 1997.

Lopez's suit was referred to the Court Annexed Arbitration Program. On July 21, 2010, the arbitrator awarded Lopez $9,000.00. Seitz requested the State to pay Lopez the amount due in compliance with the terms of the arbitration award, and stated that the firm would retain the amount owed to the law firm, but pay the remainder to the

1. The contingency fee agreement stated as follows:

 For our professional fees we have agreed that our law firm will receive one-third (33-1/3%) of any recovery obtained whether by judgment, settlement, or otherwise, or such fees that may be awarded by a Court, at my sole discretion. My firm shall have and hereby is given a lien for its fees, costs, and expenses upon any judgment or settlement and is authorized to deduct such fees, costs, and expenses therefrom and to pay the balance to you.
 (Emphases added.)

2. The Honorable Patrick W. Border presided.

3. HRS § 576D-10.5 provided in relevant part as follows:

 (a) Whenever any obligor through judicial or administrative process in this State or any other state has been ordered to pay an allowance for the support, maintenance, or education of a child, or for the support and maintenance of a spouse or former spouse in conjunction with child support, and the obligor becomes delinquent in those payments, a lien shall arise on the obligor's real and personal property and the obligor's real and personal property shall be subject to foreclosure, distraint, seizure, and sale, or notice to withhold and deliver, which shall be executed in accordance with this section or applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.

 . . . .

 (c) The child support order or judgment filed through judicial or administrative proceeding in this State or any other state shall be recorded in the bureau of conveyances. The recordation of the order or judgment in the bureau of conveyances shall be deemed, at such time, for all purposes and without further action, to procure a lien on land registered in the land court under chapter 501. The lien shall become effective immediately upon recordation of the child support order and shall attach to all interest in real or person property then owned or subsequently acquired by the obligor including any interests not recorded with the bureau of conveyances or filed in the land court.

 . . . .

 (e) Any lien provided for by this section shall take priority over any lien subsequently acquired or recorded except tax liens.
 (Emphases added.)

CSEA. Seitz also asked that the State file an interpleader action with the court in the event it refused to pay. The State took the position that it was not required to satisfy the judgment because "the CSEA lien against [Lopez] has priority over all other liens." The State agreed to file an interpleader request with the court. However, an interpleader request was never filed.

On January 14, 2011, Lopez filed a Motion for Issuance of Writ of Execution/Mandamus with the court, requesting that the State pay to Lopez the amount due. The State filed an opposition memorandum, arguing that pursuant to HRS § 507–81 (Supp.2004) (a)-(c) [4], and HRS § 576D–10.5, the CSEA lien had priority over Seitz's attorney's lien. Therefore, the State requested that the court deny Lopez's motion and "order that the State pay all judgment proceeds ... directly to the [CSEA.]" The CSEA filed a substantive joinder in the State's opposition. Lopez filed a

Reply arguing that the CSEA lien did not attach to the portion of the judgment owed to Seitz, because Seitz's lien created a property interest in the judgment and therefore the money owed to Seitz was not Lopez's property. Seitz also asserted that public policy favored giving attorneys' liens priority "over other judgment creditors' liens." On May 31, 2011, the court issued an Order denying Lopez's Motion for Issuance of Writ of Execution/ Mandamus.

B.

Lopez appealed the Order denying his Motion for Issuance of Writ of Execution/Mandamus to the Intermediate Court of Appeals (ICA). In his Opening Brief, Lopez argued, *inter alia,* that attorneys have a property interest in judgments awarded to their clients, and that property interest was protected by the due process clause in Article I,

---

4. HRS § 507–81 provided as follows:

(a) An attorney has a lien upon:
(1) Actions, suits, and proceedings after commencement of the action;
(2) Judgments, decrees, orders, settlements, and awards entered by the court in favor of the client; and
(3) Any proceeds paid in satisfaction of the judgment, decree, order, settlement, or award.
(b) The lien shall be for:
(1) The fees and compensation specifically agreed upon with the client;
(2) The reasonable value of the services of the attorney, if there is no fee agreement;
(3) Any costs advanced by the attorney; and
(4) Any fees or commissions taxed or allowed by the court.
(c) Except for tax liens, prior liens of record on the real and personal property subject to the lien created by this section, and as provided in section (d), the attorney's lien is superior to all other liens.
(d) When the attorney's lien attaches to a judgment, settlement, or decree allowing or enforcing a client's lien, the attorney's lien has the same priority as the client's lien with regard to personal or real property subject to the client's lien.
(e) The attorney's lien on a judgment, decree, order, settlement, or award remains valid as long as the judgment, decree, order, settlement, or award remains valid.
(f) To be enforceable under this section, a notice of claim of the attorney's lien shall be filed:

(1) Before the complaint is dismissed by stipulation;
(2) Before the complaint is dismissed by order of the court; or
(3) Not later than one year after entry of final judgment is filed and disposition of any appeal thereof.
(g) Except as provided by subsections (i) and (j), the attorney's lien is not affected by a settlement between the parties to the action, suit, or proceeding before or after the judgment, decree, order, or award.
(h) Except as provided by subsections (i) and (j), a party to the action, suit, or proceeding or any other person shall not have the right to discharge or dismiss any judgment, decree, settlement, or award entered in the action, suit, or proceeding until the lien and claim of the attorney for fees based thereon is satisfied in full.
(i) A judgment debtor may pay the full amount of a judgment or decree into court, and the clerk of the court shall thereupon fully satisfy the judgment or decree on the record, and the judgment debtor shall be thereby released from any further claims thereunder.
(j) If more than one attorney from the same firm appears of record for a party, the satisfaction of the lien created by this section by one of the attorneys is conclusive evidence that the lien is fully satisfied.
(k) Attorneys have the same right and power over actions, suits, proceedings, judgments, decrees, orders, settlements, and awards to enforce their liens as their clients have for the amount due thereon to them.
(Emphases added.)

Section 5 of the Hawai'i Constitution. Lopez's Reply Brief stated that "[Lopez] is asserting both [the] substantive and procedural due process rights of his attorneys in his challenge to HRS § 576D–10.5 as applied by the [S]tate in this case."

The ICA affirmed the court's order denying Lopez's Motion for Issuance of Writ of Execution/Mandamus. *Lopez v. State,* No. CAAP–11–0000512, 128 Hawai'i 497, 2012 WL 5520465 at *2 (Haw.App. Nov. 13, 2012) (mem.). The ICA did not discuss Lopez's due process arguments.

### C.

Lopez filed an Application for Writ of Certiorari, asking, *inter alia,* whether the ICA gravely erred in concluding that HRS § 507–81 did not "provide a superior or separate right for an attorney's property interest in a judgment over a prior recorded lien." Lopez again asserted that "constitutional considerations" such as an attorney's property interest in a judgment, supported satisfying an attorney's lien prior to payment of the CSEA lien.

In its Response, the State contended that "[Lopez's] substantive due process claim is [ ] frivolous" because "[t]he only property interest [Lopez's] attorney presently has is in the form of a lien." According to the State, under HRS § 507–81(c), prior recorded liens are accorded priority over attorneys' liens established by HRS § 507–81. The State asserted that giving priority to the CSEA lien "did not mean that [Lopez's] attorney lost his property interest; it means only that his property interest was itself a limited one" because it was "subordinate to CSEA's lien."

### II.

Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." The provision thus protects individuals deprived of a "property" interest by state action. *See Doe v. Doe,* *("Doe")* 116 Hawai'i 323, 333, 172 P.3d 1067, 1077 (2007) (" 'To state a claim under the fourteenth amendment [to the United States Constitution], a litigant must assert that some state action has deprived the litigant of a constitutionally protected 'liberty' or 'property' interest.' " (quoting *Child Support Enforcement Agency v. Doe,* *("CSEA v. Doe")* 109 Hawai'i 240, 247, 125 P.3d 461, 468 (2005))); *see also, Slupecki v. Admin. Dir. of Courts,* 110 Hawai'i 407, 412, 133 P.3d 1199, 1205 (2006) (recognizing the guarantee in art. I, section 5 of the Hawai'i Constitution that "no person shall be deprived of life, liberty, or property without due process of law.").

This court has recognized that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Sandy Beach Def. Fund v. City & Cnty. of Honolulu,* 70 Haw. 361, 377, 773 P.2d 250, 260 (1989) (internal quotation marks and citation omitted). Further, "[a] person's interest in a benefit constitutes a 'legitimate claim of entitlement' if it is supported by contractual or statutory language that might be invoked at a hearing." *Alejado v. City & Cnty. of Honolulu,* 89 Hawai'i 221, 227, 971 P.2d 310, 316 (App.1998) (quoting *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)) (other citation omitted).

In this case, Seitz contractually agreed to represent Lopez on a contingency fee basis, and thus his claim of entitlement is supported by contract. Seitz's fees were, in effect, wages or earnings for the firm's labor on the case. Such fees are "property" for due process purposes. *See e.g., Sniadach v. Family Fin. Corp.,* 395 U.S. 337, 338–39, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (applying procedural due process analysis to process for garnishment of wages). Hence, Seitz's attorney's fee consisting of one third of the tort recovery against the State was "property," and thus subject to the protection of the due process clause.

### III.

### A.

Contingency fee agreements afford access to the courts, most commonly for those individuals who otherwise would not be able to afford counsel. "A contingent fee contract

has been defined as a fee agreement under which the attorney will not be paid unless the client is successful." Robert L. Rossi, *Attorneys' Fees* § 2:1; *see also Black's Law Dictionary* 362 (9th ed. 2009) (defining a contingent fee as "[a] fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court"); Hawai'i Rules of Professional Conduct (HRPC) Rule 1.5(c) ("A fee may be contingent on the outcome of the matter for which the service is rendered[.]"). Consequently, "[m]ost commonly, the attorney, as compensation for services rendered in litigating the client's claim, is to receive a stipulated percentage or portion of the recovery in the event of a successful prosecution or defense of the action." Rossi, *Attorney's Fees* § 2.1 (emphases added); *see also Black's Law Dictionary* 362 ("Contingent fees are usually calculated as a percentage of the client's net recovery[.]").

Allowing the attorney to receive only a "portion of the recovery" is consonant with the purpose of contingency agreements. The purpose of the contingency fee system is to allow access to the courts for those who could not otherwise afford an attorney by "pay[ing] the lawyer <u>out of any recovery</u>." *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (1997) (emphasis added); *see also* Rossi, *Attorney's Fees* 2.3; Victor E. Schwartz & Christopher E. Appel, *Exporting United States Tort Law: The Importance of Authenticity, Necessity, and Learning from our Mistakes*, 38 Pepp. L.Rev. 551, 565 (2011) (noting that "contingency fees can have a worthy purpose, namely providing access to the legal system regardless of a person's ability to pay"); David A. Root, Note, *Attorney Fee-Shifting in America: Comparing, Contrasting and Combining the "American Rule" and "English Rule"*, 15. Ind. Int'l § Comp. L.Rev. 583, 593 (2005) ("[T]he major purpose of the contingency fee was to provide open access to the courts for all people, regardless of their financial station."); *cf.* HRPC Rule 1.8 cmt. (stating that a lawyer can advance court costs and litigation expenses, regardless of whether those funds will be repaid, because such advances are "virtually indistinguishable from contingency fees and help ensure access to the courts"). In other words, in a contingency

fee contract, the lawyer is awarded a portion of the recovery because it is assumed that the client lacks sufficient assets with which to pay the attorney. *See Arthur Andersen*, 945 S.W.2d at 818.

Similarly, the American Bar Association (ABA) Model Code of Professional Responsibility recognizes that historically, contingency fees were allowed because "(1) they often ... provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim, and (2) a successful prosecution of the claim produces a res out of which the fee can be paid." *Model Code of Prof'l Responsibility* EC 2–20 (1980). While "it is not necessarily improper" to do so, "a lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee." *Id.*

Clients who agree to be represented on a contingency basis generally lack the funds to pay an attorney personally. *See* William B. Hairston, III, *The Ranking of Attorney's Liens Against Other Liens in the United States*, 7 J. Legal Prof. 193 (1983) ("If the attorney is unable to recover his fee out of [the] judgment, then he will probably go uncompensated since a client, with so much debt that creditors are even attaching possible judgments of that client, is probably 'judgment proof.'"). Inasmuch as attorneys generally enter into contingent fee agreements with clients who could not otherwise afford their services, a personal suit against a client to recover the amount owed as a contingency fee is likely to be futile.

In addition, suits against clients can be extremely damaging to an attorney's professional reputation. *See* Zach Eisner, Comment, *Rethinking Attorney Liens: Why Washington Attorneys are Forced into "Involuntary" Pro Bono*, 27 Seattle U. L. Rev. 827, 828 (2004) (noting that "filing suit against a client may damage the attorney's reputation," and that no attorney "wants to be known as [an] attorney who sues their clients."); *see also* R.J. Robertson, Jr., *Attorney's Liens in Illinois: An Analysis and Critique*, 30 S. Ill. U. L.J. 1, 1 (2005) ("[S]u-

ing a client is not attractive from a public relations perspective."). Thus, as a practical matter, once the judgment is exhausted, any remaining attorney's lien will be abrogated. *See* Eisner, *Rethinking Attorney Liens*, 27 Seattle U. L. Rev., at 844 n. 128 ("For practical reasons, a reasonable attorney would not likely assert a lien against a former client who is unable to pay."). In practice, attorneys simply do not sue their clients to recover contingent fees if funds from the judgment are exhausted. *See id.*

Finally, because contingency fee-based clients generally do not have the ability to pay for attorneys' fees, to require an attorney to assert a lien against those clients when the entire judgment or settlement received from the lawsuit is depleted places those attorneys in an ethically compromising position. The ABA advises that an attorney "should not sue a client for a fee unless necessary to prevent fraud or gross imposition by the client." *Model Code of Prof'l Responsibility*, EC 2–23. "The same standard should be applied in determining whether or not to exercise an attorney's lien." ABA Comm. on Ethics & Prof'l Responsibility, Informal Op. 1461 (1980) (withdrawn on other grounds by Informal Op. 86–1520 (1986)). "Financial inability of the client to pay the amount owing," on a lien, however, "does not constitute fraud or gross imposition by the client." *Id.*

Therefore, an attorney is not "ethically justified" in asserting a lien when the client is financially unable to pay. Under such circumstances, the ABA advises the attorney to forego the lien. *Id.; see also Jenkins v. Weinshienk,* 670 F.2d 915, 920 (1982) (stating that "[a]n exception [to asserting an attorneys' lien] is also recognized when the client is financially unable to post a bond or pay....."). Generally, contingency-based clients are unable to pay attorneys' fees, and as an ethical matter, attorneys would have no recourse to obtain compensation for their services if the recovery is entirely consumed by the creditor, even where the recovery was

the product of the attorney's work. Consequently, the attorney's right to a lien is effectively extinguished, both ethically and as a practical matter.[5]

#### B.

The contingency fee contract provided that in the action filed on behalf of Lopez "in connection [with] an injury suffered to [his] right hand at the Halawa Correctional Facility last year," "[f]or our professional fees we have agreed that our law firm will receive one-third [ ] of any recovery obtained[.]" [RA at 51] Seitz's firm was granted "a lien for its fees, costs, and expenses <u>upon any judgment or settlement.</u>" (Emphasis added.) This appears to be standard language in contingency fee contracts. For example, the sample contingency fee contract offered by the State Bar of California states that the attorney will have a lien that "will attach to any recovery [the c]lient may obtain, whether by arbitration award, judgment, settlement, or otherwise." The State Bar of California, *Sample Written Fee Agreement Forms*, at 26, *available at* http://www.calbar.ca.gov/Attorneys/Forms.aspx.

The maxim of expressio unius est exclusio alterius applies to the interpretation of contractual terms. *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co., Inc.,* 932 F.2d 1443, 1449 (11th Cir.1991); *see also Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d 173, 179 (1st Cir. 1995). By providing that Seitz's firm had a lien on any "judgment or settlement," the contingency fee contract indicated that the lien would extend only to a judgment or settlement, seemingly, the standard provision in such contingency contracts.

#### IV.

Here, as said, the State claimed the entirety of the settlement proceeds under the CSEA lien. Thus, inasmuch as a contingency fee lien would not survive an extinguish-

---

**5.** The lien must be paid out of the <u>res</u> created through the successful prosecution of a claim. *See Model Code of Prof'l Responsibility* EC 2–20 ("Public policy properly condemns contingent fee arrangements in criminal cases, largely on the ground that legal services in criminal cases do not produce a <u>res</u> with which to pay the fee."). Where no such <u>res</u> remains, the attorney's lien is effectively null.

ment of the settlement proceeds, the lien statutes HRS §§ 576D–10.5 and 507–81 would have no relevance to the circumstances here. As an ethical and practical matter, in contingency fee cases, attorneys cannot lien their clients' property or bring suit against their clients once the judgment proceeds are exhausted, for the reasons indicated previously. Nothing indicates Lopez is able to pay Seitz the value of his fees or to reimburse Seitz for costs advanced. *ABA Model Code of Prof'l Responsibility* EC 2–20 ("A lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee.") Accordingly, Seitz must forego his lien. *See id.*, at EC 2–23.

As noted *supra*, State action resulted in the elimination of Seitz's fees and lien. Accordingly, the State's action deprived Seitz of the vested property interest that the fees represented. The State's refusal to release that part of the settlement proceeds to satisfy Seitz's attorney's fees by applying HRS § 576D–10.5(e) and HRS § 507–81 is fundamentally unfair because the lien statutes assume the continuing existence of the right to lien property of a client that may come into existence in the future. As noted, however, the contingency-fee based attorney's lien was abrogated upon the State's forfeiture of the settlement proceeds because there was no longer a judgment and therefore nothing for the attorney's lien to attach to. Enforcing priorities among liens under the statutes cited by the State and the majority is meaningless if there is no lien that Seitz could enforce beyond the settlement proceeds in the first place. Accordingly, Seitz's due process right to property, i.e. his fees, under the Hawai'i Constitution, was violated.

## V.

### A.

Recognizing that an attorney's lien itself constitutes a "property interest" is consistent with the legislative history of HRS § 507–81, which as noted, provides the basis for attorneys' liens generally. In promulgating HRS § 507–81, the legislature affirmed that one purpose of HRS § 507–81 was to "clarify an attorney's property interest in settlements and awards." H. Stand. Comm. Rep. No. 1016–04, in 2004 House Journal, at 1814. The committee explained that HRS § 507–81 "vest[ed] attorneys with clear property interests." *Id.* (emphasis added). Other courts have also explicitly held that an attorney's lien is a property right. *See Reed v. Garner Industries, Inc.*, 832 S.W.2d 945, 948 (Mo.Ct. App.1992) ("An attorney's lien upon a cause of action [gives] a property right [to] the attorney."); *cf. LMWT Realty Corp. v. Davis Agency Inc.*, 85 N.Y.2d 462, 626 N.Y.S.2d 39, 649 N.E.2d 1183, 1186 (1995) (holding that a lien created pursuant to a contingent fee agreement gives an attorney a "vested property interest"). However, such considerations do not apply if the attorney may only look to the proceeds of the recovery to satisfy his fees. Unlike other lienors, the contingency-fee based attorney cannot retain lien rights into the future in the hope that the debtor will obtain assets that may be liened. The majority maintains that the legislature did not intend to grant an attorney an "exclusive property interest that is therefore not subject to any prior recorded liens." Majority opinion at 26 (emphasis in original). However, Seitz had a "property interest" in the fees for purposes of the due process clause of the Hawai'i Constitution, separate and apart from any purported right to place a lien on the recovery.

### B.

The purpose of HRS § 576D–10.5, to obtain additional monetary funds for the State, is promoted when attorneys sue on behalf of child support obligors. If a suit is successful, some or all of the child support could be paid. *See* note 3, *supra*. On the other hand, this interest is diminished when attorneys are not able to obtain fees earned by their representation from a fund that they brought into existence. *Cf. Cetenko v. United California Bank*, 30 Cal.3d 528, 536, 179 Cal.Rptr. 902, 638 P.2d 1299 (1982) (noting that discouraging attorneys from initiating suits on behalf of clients who owe debts "would be detrimental not only to prospective litigants, but to

their creditors as well").[6] This case is not about choosing between paying an attorney[7] or paying for child support; rather, the statutory scheme as applied by the State and the majority fails both the attorney and the child support system generally. Allowing rightful remuneration to the attorney for services already performed preserves opportunities for the recovery of child support monies.[8]

## VI.

The majority states that Seitz had "constructive notice of the CSEA lien insofar as the administrative order regarding Lopez's child support debt was filed in the Bureau of Conveyances before the attorneys entered into a contingency agreement with Lopez." Majority opinion at 30. Similarly, at oral argument, the State contended that Seitz had notice of the CSEA lien because it was recorded.

However, from a factual standpoint, it is evident that Seitz did not have actual notice that the firm would not receive any fees from their representation, because had the firm known this, it would not have entered into a contingency fee contract with Lopez. *See* footnote 6, *supra.* Second, neither the State nor the majority cite any authority in support of their assertion that Seitz would have had "constructive notice" that the firm would not be able to recover its contingency fee. *Black's Law Dictionary* defines "constructive notice" as "notice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of, such as a registered deed or a pending lawsuit, notice presumed by law to have been acquired by a person and thus imputed to that person." *Black's Law Dictionary* 1164.

In this case, there can be no constructive notice imputed to Seitz that the firm would not receive payment. The contingency fees were in effect extinguished by the State's assertion of the CSEA lien. There is no "presumption of law" that the lien statute would have to be applied to foreclose contingency-based fees when such fees could not be the subject of the lien statutes in the first place. Respectfully, under the circumstances, it cannot be assumed that Seitz had constructive notice, where, as explained *supra,* the State was seemingly acting against the public's interest in promoting the recovery of child support by precluding Seitz's recovery of the fees he earned and the costs he advanced.

## VII.

Under the interpretation by the State and the majority, attorneys are not entitled to compensation for their labor, even when the State may be able to ultimately increase the amount accruing to child support beneficiaries through the labor of such attorneys. This cannot, under any conceivable factual scenario, be said to further the public interest.

The majority contends that "it would be improper for this court to rely on policy principles to reach [an interpretation contrary to the language or legislative history of HRS § 576D–10.5 or HRS § 507–81]," majority opinion at 31. However, Seitz's "policy principles" actually point to the lack of a rational basis for the operation of HRS § 576D–10.5(e) and HRS § 507–81(c) in this case. Despite the fact that, as the majority points out, " 'neither the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy when the legislature has clearly and unambiguously spoken,' " majority's opinion at 32 (alteration omitted) (quoting *State v. Harada,* 98 Hawai'i 18, 50, 41 P.3d 174, 206 (2002) (Acoba, J., concurring and

6. At oral argument, Seitz explained that due to the CSEA's interpretation of HRS §§ 576D–10.5 and 507–81, his firm had discontinued its representation of prospective clients who are the subject of CSEA liens.

7. The amount of attorney's fees would be constrained by HRPC Rule 1.5(a) which states, "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." In contingency fee cases, "the risk of no recovery and the conscionability of the fee in light of the net recovery to the client" must be considered. HRPC Rule 1.5(a)(8).

8. Of course, if the amount recovered were sufficient to cover the child support component in this case and the attorney's fees no dispute would arise.

dissenting)), courts <u>are</u> empowered to hold that the government's action violates the due process rights of an individual. The law must afford a remedy for the deprivation of that right, for a "right" that lacks a remedy is no right at all.

For that reason, I must respectfully dissent.